*1222 KNOLL, Justice.
| ¶ This medical malpractice action presents the issue of whether La.Rev.Stat. § 40:1299.47(H) mandates the admission of a medical review panel opinion when the panel exceeds its statutory authority and renders an opinion based on its determination of plaintiffs’ credibility, not on the medical standard.
After submitting their medical malpractice complaint to a medical review panel and the rendition of the panel’s opinion, plaintiffs, Margie and John McGlothlin, filed the instant suit against defendant, Christus St. Patrick Hospital. Over both parties’ objections, the District Court admitted the panel’s opinion, subject to its redaction of all credibility language, and subsequently rendered judgment in conformity with the jury’s verdict in favor of the hospital. The Court of Appeal reversed, finding the lower court erred in admitting an edited version of the opinion. Under de novo review, the appellate court concluded plaintiffs proved the hospital’s malpractice caused the injury, awarding plaintiffs both general and special damages. We granted this writ to address the correctness vel non of the appellate court’s reversal. McGlothlin v. Christus St. Patrick Hospital, 10-2775 (La.3/4/11), 58 So.3d 462. For the following reasons, we find while the medical | ¡.review panel opinion was inadmissible, its admission was nevertheless harmless error and, therefore, the appellate court erred in its de novo review. Finding no manifest error in the jury’s verdict, we reverse the judgment of the Court of Appeal and reinstate the District Court’s judgment.
FACTS
On May 17, 1999, Margie McGlothlin was admitted to Christus St. Patrick Hospital for bilateral total knee replacement surgery.[1] Dr. Lynn Edward Foret, an orthopedic surgeon, successfully performed the surgery,[2] and Margie’s initial recovery was uneventful.
Three days later, Dr. Foret issued orders transferring Margie from the post surgery unit to the rehabilitation unit. During the course of her stay in “rehab” from May 20, 1999 through May 28, 1999, Margie had consistent progression in her rehabilitation; her records reflected she went from ambulating twenty-five feet with a standard walker up to three hundred feet. However, on Friday, May 28, 1999, Margie was progressing in her therapy session before the onset of pain to her left knee. At that point, her session was suspended, and she was taken back to her room where the nurses awaited further orders. An order was received to perform an x-ray, and it was determined from the films Margie had suffered a patella dislocation. As a result of that dislocation, Margie underwent significant medical Jjtreatment to address both the dislocation and the substantial infectious complica *1223 tions arising therefrom — nine surgical procedures in total, including the removal of the prosthesis in her left knee. The specific cause of the patella’s dislocation is the underlying issue in this litigation.
Pursuant to La.Rev.Stat. § 40:1299.47, the McGlothlins first submitted their claims for damages to a medical review panel, alleging that two incidents — the first occurring on May 20, 1999, and the second occurring on May 29, 1999 — involving the transfer or attempted transfer of Margie from her wheelchair to (1) her hospital bed and (2) a commode caused damage to her left knee arthroplasty. On June 13, 2005, the panel, composed of orthopedic surgeons David DeLapp, Lee Leonard, and Gregory Gidman, rendered a unanimous opinion in favor of Christus St. Patrick Hospital, rejecting plaintiffs’ claims for their “inconsistencies”:
The Medical Review Panel, comprised of the undersigned, convened in the above captioned matter, and after due proceedings and review of the evidence presented, renders the following unanimous decision:
The evidence does not support the conclusion that the defendant, Chris-tus St Patrick Hospital, failed to comply with the appropriate standard of care as charged in the complaint.
Written reasons for opinion:
The post-surgery patella dislocation and infection are known complications of this procedure, and could have occurred without any negligence on the part of the hospital. The patient and her family allege that two incidents occurred involving hospital staff that caused a twisting injury and an acute flexation injury, damaging the total knee arthroplasty, resulting in a dislocated patella. However, the LPN alleged to be involved in the initial incident on May 20,1999, upon admit to the rehab unit, emphatically denies that any incident occurred; the alleged incident was not documented in the hospital records at the time of the occurrence; no contemporaneous Incident Report was filed; the patient did not report the incident during the hospital assessment report done at the time of the rehab admit; the patient did not report the incident to the P.A. the following morning; and the patient attended physical therapy for several days thereafter with progress being noted. On May 28, 1999, an x-ray was |4ordered which showed lateral displacement of the left kneecap, possibly due to rotation or true lateral displacement, but the patient and her family allege the second incident occurred in the bathroom on May 29, 1999, a day later. Once again, the CNA alleged to be involved in the second incident emphatically denies that any incident occurred, the alleged incident was not documented in the hospital records at the time of occurrence, and no contemporaneous Incident Report was filed. The follow-up x-rays of May 31, 1999, and June 1, 1999, do indicate that lateral displacement was occurring, but we feel that the versions of both of the incidents, by the patient and her family, appear to have numerous inconsistencies. (Bold emphasis in original; underlining indicative of redaction).
Thereafter, the McGlothlins filed the instant suit against Christus St. Patrick Hospital, alleging two separate acts of medical malpractice by two attending certified nursing assistants (CNA) caused the patella dislocation Margie suffered:
III.
While hospitalized, on May 20, 1999 she was transferred to rehabilitation. At the time of the transfer an employee *1224 of Christus St. Patrick Hospital tried to put the Plaintiff on the bed without any help. The Plaintiff was half dropped and hurt her knee which had just been operated on. Plaintiff alleges that the factual basis for this proceeding involve unusual occurrences during the time of medical supervision by the Defendant, at a time when the Plaintiff was under the total care, custody and control of the Defendant, and its employees and warrant the imposition of the doctrine of Resipsa loquitur [sic].
IV.
Following the incident, the Plaintiff was administered pain medication because of the injury that day. Dr. For-et’s [P.A.] David Guillory examined the knee when he was contacted. Dr. Foret examined the knee at the time and felt it would be alright even though they had to administer pain medication. She continued to be in pain from the knee.
V.
On May 29, 1999, the Plaintiff while still under the total care, custody, and control of the Defendant, was being helped to the restroom in rehabilitation. A plastic commode seat was attached to the commode to raise the position where the Plaintiff would be sitting so as not to have to bend her knees very much. The commode seat was not properly fastened and because of this it gave way when the Plaintiff tried to mount it and she was seriously injured. The x-rays taken later that day showed that the Plaintiff had displaced the patella in the knee. The displacement caused the Plaintiff to undergo another surgery in which an infection occurred causing further complications.
|fiThe three-day jury trial on the merits began on June 16, 2009. During trial it was not disputed Margie sustained a patella dislocation while under the care, custody, and control of the hospital; she was under the hospital’s care, custody, and control at the time both instances allegedly occurred; the CNA’s involved in the alleged transfers were employees of Chris-tus St. Patrick Hospital; and the standard of care applicable to the movement of a morbidly obese bilateral total knee replacement patient from a wheelchair to a bed or commode required the coordination of more than one trained individual and/or the assistance of a gait belt and/or walker. The primary disputes were whether the two alleged events actually occurred and whether the medical review panel opinion was admissible.
By way of defense, the hospital and its employees emphatically denied either event occurred as alleged by the McGloth-lins and meticulously outlined the inconsistencies in plaintiffs’ versions of the events. The hospital also presented the expert testimony of orthopedic surgeon, Dr. Leonard, who opined dislocation of a prosthetic patella is a known complication of bilateral knee replacement surgery and could result from physical therapy. Through his testimony, the hospital also introduced the medical review panel opinion. However, prior to its introduction and in response to plaintiffs’ motion in limine, the District Court redacted the first sentence in its entirety and the last clause of the final sentence. Subject to both parties’ objections, Dr. Leonard read the panel’s redacted opinion to the jury.
After deliberation, the jury returned a verdict in favor of Christus St. Patrick Hospital, finding plaintiffs did not prove by a preponderance of the evidence defendant “deviated from the appropriate standard of care owed to the plaintiffs.” The District Court then entered judgment in accordance with the jury verdict.
On appeal, the Court of Appeal, Third Circuit, reversed, finding the medical review panel opinion rendered on the merits *1225 in violation of La.Rev.Stat. § | fi40:1299.47(G) was not admissible and the District Court erred in edited version of the opinion. McGlothlin v. Christus St. Patrick Hospital, 10-0278 (La.App. 3 Cir. 11/17/10), 50 So.3d 967. Specifically, the appellate court found the lower court’s attempt to redact the offensive language did not cure the panel’s violation of its statutory mandate because “a clear reading of what remains of the medical review panel’s opinion establishes to the reader that the underlying dispute was factual and not legal.” Moreover, through the testimony of Dr. Leonard, the jury became fully informed of the panel’s opinion and of how the panel reached its opinion, ie., its discrediting of plaintiffs’ version and its reliance on the medical record. Finding the lower court’s “erroneous admission of the medical review panel’s redacted opinion and Dr. Leonard’s direct testimony concerning the inner workings of the panel tainted the integrity of the trial,” the appellate court reviewed the record de novo, concluding the plaintiffs “carried their burden of establishing that on one occasion, May 28, 1999, a hospital employee breached her duty of care due to Mrs. McGlothlin when she attempted to transfer Mrs. McGlothlin without assistance, and that this breach resulted in an injury to Mrs. McGlothlin’s left knee.” Accordingly, the appellate court rendered judgment in plaintiffs’ favor, awarding $500,000 in general damages and $62,341.29 in past medical expenses “and the expenses of reasonable medical treatment that will be incurred after the date of the trial court judgment.” admitting an
DISCUSSION
The primary issue in this litigation is whether under the extensive statutory scheme of our Medical Malpractice Act (MMA) a medical review panel opinion is admissible when the panel exceeds its statutory duty and renders an opinion based on its decision to credit the evidence presented by one party over another. our discussion begins with the MMA and its medical review panel requirement. ^Accordingly,

The Medical Review Panel

In response to a perceived crisis in this state caused by prohibitive costs in connection with medical malpractice insurance, our Legislature enacted the MMA in 1975, with the intended purposes of reducing or stabilizing medical malpractice insurance rates and ensuring the availability of affordable medical services to the general public. Spradlin v. Acadia-St. Landry Medical Foundation, 98-1977, p. 6 (La.2/29/00), 758 So.2d 116, 120; Hutchinson v. Patel, 93-2156 (La.5/23/94), 637 So.2d 415, 422. In order to achieve these ends, the MMA provided qualified health care providers with a number of advantages in derogation of the general rights of tort victims. Galloway v. Baton Rouge General Hosp., 602 So.2d 1003, 1005-06 (La.1992); Everett v. Goldman, 359 So.2d 1256, 1262-63 (La.1978).
One of the principal advantages provided to qualified health care providers was that no action for malpractice against them or their insurers could be commenced in any court prior to submission of the complaint to a medical review panel, composed of three health care providers and one attorney, and the panel’s issuance of its expert opinion. La.Rev.Stat. § 40:1299.47(B)(1)(a)(i); Galloway, 602 So.2d at 1006; Everett, 359 So.2d at 1263; see also La.Rev.Stat. § 40:1299.47(0) (“The medical review panel shall consist of three health care providers who hold unlimited licenses to practice their profession in Louisiana and one attorney.”). Although this requirement could be waived by the agreement of the parties, it was “assumed that most malpractice cases against qualified health care providers will *1226 be filtered through such a panel.” Everett, 359 So.2d at 1263; see also La.Rev.Stat. § 40:1299.47(B)(l)(c). Moreover, we further explained:
|sPretrial screening through a medical review panel is designed to weed out frivolous claims without the delay or expense of a court trial. It is thought that the use of such panels will encourage settlement because both parties will be given a preliminary view of the merits of the case. If a claim is found by the panel to be without merit it is thought that the claimant will be likely to abandon his claim or agree to a nominal settlement. Moreover, a plaintiff who gains a favorable opinion from the panel may be able to negotiate a favorable settlement with his defendants, a procedure which also avoids much of the time and expense of a trial. Thus, to the extent that the use of medical review panels encourages settlement of suits before trial, litigation costs will probably be reduced. Because out of court settlements usually do not garner the publicity of jury verdicts it is also hoped by proponents of the legislation that publicity concerning the award figure will be minimal and that this fact will gradually reduce awards granted by juries. Additionally since jury awards are believed generally to be larger than settlements, the increase in prevalence of the latter should serve to reduce the overall payment of claims. Thus, litigation costs and actual awards are expected to be lessened by virtue of the employment of pre-suit medical review panels.
Everett, 359 So.2d at 1264 (citations omitted).
Under this scheme, the sole duty of the panel is
to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care. After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty days, render one or more of the following expert opinions, which shall be in writing and signed by the panelists, together with written reasons for them conclusions:
(1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
(3) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court.
(4) When Paragraph (1) of this Subsection is answered in the affirmative, that the conduct complained of was or was not a factor of the resultant damages. If such conduct was a factor, whether the plaintiff suffered: (a) any disability and the extent and duration of the disability, and (b) any permanent impairment and the percentage of the impairment.
_L2La.Rev.Stat. § 40:1299.47(G).
Any report of the medical review panel’s expert opinion “shall be admissible as evidence in any action subsequently brought by the claimant in a court of law.” La.Rev.Stat. § 40:1299.47(H). Such expert opinion, however, “shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness.” Id. Thus, the opinion of the medical review panel “is admissible, expert medical evidence that may be used to support or *1227 oppose any subsequent medical malpractice suit.” Samaha v. Rau, 07-1726, p. 15 (La.2/26/08), 977 So.2d 880, 890; Galloway, 602 So.2d at 1007. Nevertheless, as with any expert testimony or evidence, the medical review panel opinion is subject to review and contestation by an opposing viewpoint. Samaha, 07-1726 at p. 15, 977 So.2d at 890. The opinion, therefore, can be used by either the patient or the qualified health care provider, and the jury, as trier of fact, is free to accept or reject any portion or all of the opinion. Everett, 359 So.2d at 1269.
In the present matter both parties sought an all or nothing ruling on the admissibility of the panel opinion. On one hand, plaintiffs sought to exclude the opinion in its entirety because of the panel’s credibility determinations upon which its ultimate opinion was based. In support of their position, plaintiffs cited the statutory duty of the panel and Third Circuit jurisprudence, arguing the panel, by exceeding its duty and invading the province of the factfinder, rendered its opinion legally invalid and inadmissible. See Whittington v. Savoy, 05-1169, p. 3 (La.App. 3 Cir. 5/31/06), 931 So.2d 1198, 1201 (holding the mandatory language of La.Rev.Stat. § 40:1299.47(H) “presupposes the validity of the opinion itself’). The defense, on the other hand, argued the mandatory language of the statutory provision requires the admission of the opinion in its entirety, regardless of its |incontent. In support thereof, the defense cited this Court’s holding in Galloway that the panel’s opinion and findings “are admissible by virtue of the statutory provision, La. R.S. 40:1299.47(H), and the statutory scheme put in place by the [MMA],” 602 So.2d at 1007, as well as the Second and Fourth Circuit cases rendered in reliance therewith. See Hunter v. Bossier Medical Center, 31,026, p. 13 (La.App. 2 Cir. 9/25/98), 718 So.2d 636, 644 (“the clear language of that statute makes the report of the MRP admissible at trial, even where ‘technical’ defects exist”); Beaucoudray v. Walsh, 07-0818, p. 21 (La.App. 4 Cir. 3/12/09), 9 So.3d 916, 927 (holding “a simple reading of La. R.S. 40:1299.47(H) mandates the admissibility of the MRP opinion”), writ denied, 09-0832 (La.5/29/09), 9 So.3d 168.[3]
However, any reliance on our holding in Galloway in the present matter is misplaced because that decision did not involve a substantively defective panel opinion; rather, it involved a situation in which all three panel members, years after properly rendering their unanimous expert opinion, simply changed their minds. Moreover, because the circuits are clearly split on the admissibility of panel opinions rendered based on the panel’s credibility determinations, it falls to this Court to resolve the issue by first interpreting the relevant statutory provisions and then applying them to the facts herein.
Under well-established law, because “all of the limiting provisions applicable to qualified health care providers are ‘special legislation in derogation of the rights of tort victims,’ these provisions are all strictly construed.” Spradlin, 98-1977 at p. 6, 758 So.2d at 120 (quoting Sewell v. Doctors Hosp., 600 So.2d 577, 578 (La. 1992)). Moreover, in accord with the general rules of statutory h,interpretation, the interpretation of any statutory provision begins with the language of the statute itself. In re Succession of Faget, 10-0188, p. 8 (La.11/30/10), 53 So.3d 414, 420.
When the provision is clear and unambiguous and its application does not lead to *1228 absurd consequences, its language must be given effect, and its provisions must be construed so as to give effect to the purpose indicated by a fair interpretation of the language used. La. Civ.Code art. 9; La.Rev.Stat. § 1:4; In re Clegg, 10-0323, p. 20 (La.7/6/10), 41 So.3d 1141, 1154. Unequivocal provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. La. Civ.Code art. 11; La.Rev. Stat. § 1:3; see also Snowton v. Sewerage and Water Bd., 08-0399 at pp. 5-6 (La.3/17/09), 6 So.3d 164,168.
Words and phrases must be read with their context and construed according to the common and approved usage of the language. La.Rev.Stat. § 1:3. “The word ‘shall’ is mandatory and the word ‘may[5] is permissive.” Id. Further, every word, sentence, or provision in a law is presumed to be intended to serve some useful purpose, that some effect is given to each such provision, and that no unnecessary words or provisions were employed. Colvin v. Louisiana Patient’s Compensation Fund Oversight Bd., 06-1104, p. 6 (La.1/17/07), 947 So.2d 15, 19; Moss v. State, 05-1963, p. 15 (La.4/4/06), 925 So.2d 1185, 1196. Consequently, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to and preserving all words can legitimately be found. Colvin, 06-1104 at p. 6, 947 So.2d at 19-20; Moss, 05-1963 at p. 15, 925 So.2d at 1196.
Where two statutes deal with the same subject matter, they should be harmonized if possible, as it is the duty of the courts, in the construction of 112statutes, to harmonize and reconcile laws. LeBreton v. Rabito, 97-2221, p. 7 (La.7/8/98), 714 So.2d 1226, 1229; Chappuis v. Reggie, 222 La. 35, 44, 62 So.2d 92, 95 (1952); La. Civ.Code art. 13. However, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character. LeBreton, 97-2221 at p. 7, 714 So.2d at 1229; Kennedy v. Kennedy, 96-0732, p. 2 (La.9/9/97), 699 So.2d 351, 358 (on rehearing). Accordingly, we are bound to a strict interpretation of the plain language of the statutory provisions to which we now turn.
La.Rev.Stat. § 40:1299.47(H) specifically provides: “Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action brought by the claimant.” Accordingly, under the plain language of this provision, a panel’s expert opinion is and shall be admissible. What constitutes an expert opinion, however, is clearly and succinctly defined in the preceding statutory provision, La.Rev.Stat. § 40:1299.47(G), which states “the panel ... shall render one or more of the following expert opinions ”:
(1) The evidence supports the conclusion ... defendant ... failed to comply with the appropriate standard of care....
(2) The evidence does not support the conclusion ... defendant ... failed to meet the applicable standard of care....
(3) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court.
(4) When Paragraph (1) of this Subsection is answered in the affirmative, that the conduct complained of was or was not a factor of the resultant damages. If such conduct was a factor, whether the plaintiff suffered: (a) any disability and the extent and duration of the disability, and (b) any permanent impairment and the percentage of the impairment.
*1229 Given the plain language of this provision, an expert opinion is one rendered on the issues of whether or not the evidence supports a finding of substandard medical care and whether and to what degree that substandard care contributed to the resultant damages. However, when there exists “a material issue of fact, not | ^requiring an expert opinion, bearing on liability for consideration by the court,” the statutory provision requires the opinion of the panel simply acknowledge the material issue and defer to the factfinder’s consideration. In this way, the Legislature successfully retains the benefit of the panel members’ education and training in the resolution of potentially complex medical issues, while preserving to the court and the jury their factfinding function.[4]
Correspondingly, the panel’s sole duty under our medical malpractice scheme “is to express its expert opinion as to whether or not the evidence supports the conclusion the defendant or defendants acted or failed to act within the appropriate standard of care.” La.Rev.Stat. § 40:1299.47(G); see also Samaha, 07-1726 at p. 14, 977 So.2d at 889. In performing this duty, the panel is not permitted to render an opinion on any disputed issue of material fact that does not require their medical expertise.
With the standard of care not in dispute, the primary issue of whether the alleged acts of negligence even occurred in this case was one of material fact, the resolution of which did not require an expert medical opinion nor would have benefited from the panel’s medical expertise. Therefore, by answering this material question of fact, the panel superseded its statutory authority. More significantly, by discrediting plaintiffs’ evidence and relying strictly upon the medical records, the panel impermissibly rendered an opinion based on its resolution of an issue La.Rev. Stat. § 40:1299.47(G)(3) clearly and explicitly 1 ^reserved to the jury. Simply stated, although a panel may render more than one opinion, the panel in this circumstance was not permitted to render one on whether the hospital’s actions complied with the applicable standard of care as provided for in La.Rev.Stat. § 40:1299.47(G)(1) or (G)(2) because there existed a material issue of fact bearing on that very issue of liability, which did not required their medical expertise.
Thus, while seemingly complying with the statutory mandate of La.Rev. Stat. § 40:1299.47(G)(2) by finding “the evidence does not support the conclusion that the defendant ... failed to comply with the appropriate standard of care,” the opinion rendered in this matter nevertheless does not conform to any of the statutory definitions because it is not based on the applicable medical standard or the panel’s medical expertise, but rather, on its impermissible credibility determinations. It logically follows, therefore, the opinion rendered in this matter does not constitute an expert opinion as contemplated in the statutory scheme and, consequently, is neither subject nor entitled to the mandatory *1230 admission requirement for expert opinions set forth in La.Rev.Stat. § 40:1299.47(H). Moreover, to the extent the panel’s opinion exceeded its statutory authority and sought to resolve a material issue of fact explicitly reserved to the jury, we find the opinion is inadmissible.
However, any error on the District Court’s part in admitting the opinion was rendered harmless by its redaction of the offending credibility language. As the record clearly demonstrates, the edited opinion summarized the position of the parties and the evidence already presented to the jury without any indication of the panel’s credibility determinations. Therefore, this evidence was merely corroborative and cumulative of other properly introduced evidence. See State v. Taylor, 01-1638, p. 22 (La.1/14/03), 838 So.2d 729, 748 (admitting improper 11fievidence “which is merely corroborative and cumulative of other properly introduced evidence is harmless [error]”). Because this error “did not rise to a level which precluded the jurors from reaching a verdict based on the law and facts,” we find the appellate court erred in determining de novo review of the record was necessary in this regard. Wooley v. Lucksinger, 09-0571, p. 68 (La.4/1/11), 61 So.3d 507.
Moreover, regarding the District Court’s alleged error in admitting Dr. Leonard’s expert testimony, well-settled law gives the trial court much discretion in determining whether to allow a witness to testify as an expert under La. Code Evid. art. 702, and its judgment will remain undisturbed unless that discretion was abused. Cheairs v. State ex rel. Dep’t of Transp. & Dev., 03-680 (La.12/2/03), 861 So.2d 536. As the record clearly shows, Dr. Leonard testified regarding his opinions on causation and breach of the standard of care; he did not testify to the panel’s impermissible and inadmissible conclusions on these issues.[5] Accordingly, we find no abuse of the District Court’s discretion in admitting his expert testimony concerning his expert opinion alone and further find the appellate court further erred in determining de novo review was necessary.
Given the harmlessness of the District Court’s error and the absence of an abuse of its discretion, we hold the jury’s verdict must be reviewed for manifest error. Moreover, because the evidence concerning the issue before us was fully developed at trial and considering the passage of time, “we now exercise our appellate jurisdiction of both law and fact in civil matters in the interests of judicial economy and efficiency and review the jury’s verdict for manifest error.” Wooley, | 09-0571 at p. 68, 61 So.3d 507; see also Campo v. Correa, 01-2707, p. 11 (La.6/21/02), 828 So.2d 502, 510; see also, La. Const. Art. V, § 5(C).

Manifest Error Review

Under the manifest error standard, a determination of fact is entitled to great deference on review. Guillory v. Lee, 09-0075, p. 14 (La.6/29/09), 16 So.3d 1104, 1116; Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74.
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of re *1231 view is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Guillory, 09-0075 at p. 14, 16 So.3d at 1116-17 (quoting Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606). Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb its findings on review. Guillory, 09-0075 at p. 14, 16 So.3d at 1117.
An appellate court, in reviewing a jury’s factual conclusions, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be clearly wrong. Kaiser v. Hardin, 06-2092, pp. 11-12 (La.4/11/07), 953 So.2d 802, 810; Guillory v. Insurance Co. of North America, 96-1084, p. 5 (La.4/8/97), 692 So.2d 1029, 1032. This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court’s findings. The court must review the entire record to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Guillory, 09-0075 at p. 16, 16 So.3d at 1118; Kaiser, 06-2092 at p. 12, 953 So.2d at 810. The issue to be l17resolved on review is not whether the jury was right or wrong, but whether the jury’s fact finding conclusion was a reasonable one. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).[6]
Notably, reasonable persons frequently disagree regarding factual issues in a particular case. Guillory, 09-0075 at pp. 15-16, 16 So.3d at 1117. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844. “Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Canter, 283 So.2d at 724. An appellate court on review must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Rosell, 549 So.2d at 844. Simply stated,
[w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact-finder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. [Citations omitted].
Id. at 844-45.
In a medical malpractice action against a hospital, the plaintiff must prove, *1232 as in any negligence action, the defendant owed the plaintiff a duty to protect | ^against this risk, the defendant breached that duty, the plaintiff suffered an injury, and the defendant’s actions were a substantial cause in fact of the injury. Smith v. State through Dept. of Health and Human Resources Admin., 523 So.2d 815, 819 (La.1988). “A hospital is bound to exercise the requisite standard of care toward a patient that the particular patient’s condition may require and to protect the patient from external circumstances peculiarly within the hospital’s control.” Id. Whether a hospital has breached those duties depends upon the circumstances and facts of the case. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974). Moreover, the resolution of whether the alleged malpractice constitutes negligence as well as the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, falls within the province of the trier of fact. Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1277-78 (La.1991).
Unlike most medical malpractice cases, the applicable standard of care was not contested in this matter, neither was the fact that Margie suffered a patella dislocation in her left knee. Rather, the dispute centered around whether or not the events plaintiffs alleged even occurred. Both sides presented equally plausible explanations for how the injury occurred, and the primary issue for the jury was not whether something constituted malpractice, but whether something was even done. Because the resolution of that factual issue was soundly within the jury’s discretion, we must now determine whether the jury’s fact finding conclusion was a reasonable one by examining the record in its entirety-
As previously discussed, plaintiffs alleged in their petition two separate incidents of malpractice occurring on May 20 and May 29, 1999, respectively. The May 20, 1999 incident involved allegations Margie was improperly transferred |19from a wheelchair to her bed.[7] The second incident involved the transfer of Margie from a wheelchair to a commode.
At trial, plaintiffs, through the testimony of nursing expert Glenda Joiner-Rogers, established the standard of care in transferring a patient of Margie’s size and mobility, i.e., the coordination of two trained individuals with the assistance of a gait belt or walker. Nurse Rogers also testified the CNA would have breached the applicable standard of care had the transfer to the commode occurred as plaintiffs alleged, i.e., with the assistance of only one trained individual and without a walker. She admitted, however, she had not reviewed the entirety of the record from Margie’s surgical or rehab stay and did not know whether the incident occurred.
Next, Margie testified regarding her recollection of the incident. She explained CNA Peggy White took her in her wheelchair to use the rehabilitation bathroom, placed the wheelchair by the side of the commode, and placed the plastic seat riser onto the commode without “locking” the riser. CNA White then stood on one side of Margie and lifted her up under her left arm. After CNA White had lifted Margie partially up and she began to sit on the riser, Margie explained her left knee bent and she went to the floor: “when she tried pulling me up, she could not hold me because I was so heavy; and so, I went down. And my knee folded — my left fell— *1233 went up under me, and I screamed.” CNA White then assisted Margie back into the wheelchair, but her left knee was already swelling and “very, very painful.” Margie asked to be returned to her room, and upon her return, she immediately telephoned her husband and Dr. Foret to report the fall. | gnShe clearly recalled Dr. Foret came to her room soon thereafter and ordered an x-ray.
Significantly, through Margie’s testimony, plaintiffs tried to explain the inconsistencies between the date alleged in their petition, May 29, and the date the x-ray revealed the dislocation of her patella, May 28, by focusing on her “memory markers.” Although Margie did not know the dates, she did recall the events that coincided with the day she hurt her knee in the rehab bathroom: (1) her left knee was hurting and she was crying in bed; (2) she called Dr. Foret on the phone; (3) an x-ray was performed; and (4) she received morphine immediately for the pain. She also specifically remembered telling Dr. Foret about the commode incident before the x-ray was taken in her room. On cross examination, she did concede, however, her hospital chart indicated she first received morphine on June 2, 1999, and the nurse’s note for that same day recorded her “crying, on the telephone. Dr. Foret comes up and new treatment initiated.”
Dr. Foret then testified that, after receiving a complaint from Margie that she had injured her knee in the bathroom on May 28, 1999, he ordered an x-ray of Margie’s left knee. He recalled Margie telling him she had been in the bathroom with an aide trying to get her up when her knee went to the side:
Well, if I can remember correctly, it was a discussion she and I had about— she was in a small area of the bathroom, if I can remember correctly; and she was asking for her walker, I believe. She was manipulating with her walker and that — the nurse’s aide or an LPN or whoever was with her at the time told her she could lift her. She could help her up and turn around and get out of the compartment apparently, and she— she couldn’t stand because of — she was probably weak and the foot might have slipped or something and — but she related to me that the knee went to the side and that’s when the pain started because the kneecap dislocated. And — she was just very upset because it had happened ....
|2iUpon his orders, the x-ray was taken that same day, and a radiologist’s subsequent report revealed there was a possible lateral patella displacement, meaning “the kneecap ha[d] come off.”
According to Dr. Foret, a displaced patella is usually caused when the patient’s foot slips to the side and a valgus angle is created, so that the kneecap goes to the outside.[8] The danger of this kind of injury is one of the very reasons why a patient who is recovering from knee replacement surgery is transported by multiple people to try to maintain stability of the knee. The doctor also noted that, in Margie’s case, this extra assistance was made even more important given her obesity. He further described the injury to Margie’s kneecap as completely consistent with the *1234 accident she described to him on May 28, 1999.
While noting setbacks in rehabilitation occur regularly from knee pain, weakness, or bursitis setting in, Dr. Foret clarified “a trauma event is when the kneecap would dislocate,” and that in twenty-five years of practice, he had no other patient “totally dislocate their kneecap” following a bilateral knee replacement surgery. However, he did concede in rehab “[t]hey are working them pretty hard,” and “[s]omeone who hasn’t been pushed that hard, many times you get to a point where they have a setback.” Reading from the rehab notes, he opined Margie was making excellent progress in rehab from May 23 to May 27 and was standing five minutes on May 28, which was very good in his opinion, “before complaint of pain to left knee.”
[¡^Finally regarding Margie’s “memory markers,” ie., the events she associated with the day of the incident, Dr. Foret testified Margie’s chart noted on June 2, 1999, she (1) was crying (2) called Dr. Foret, who came to see her, and (3) was given morphine:
at approximately 13:45 ... patient crying in room, on telephone; continues to complain of pain; at 1400 ... Dr. Foret here to see the patient.... given morphine [on Dr. Foret’s orders].
Dr. Foret also conceded he had no personal knowledge of the commode incident beyond what Margie told him.
Plaintiffs’ three remaining witnesses, Margie’s daughter, granddaughter, and husband, also had no first-hand knowledge of the incident and likewise merely testified concerning what was conveyed to them. Plaintiffs’ daughter, Genevieve Marks, and their granddaughter, Flavia McGlothlin, both understood Margie “got hurt with the potty” when the unlatched riser “broke and fell.” John, Margie’s husband, understood his wife was “carried to the bathroom, you know, and the wheelchair wouldn’t get there and the commode seat wasn’t locked.” He further testified Margie called and told him: “They have dropped me [and] my knee is swoll. I can’t move.” According to his recollections, Dr. Foret and his assistant were just leaving Margie’s room when he arrived at the hospital later that day, and a machine was then brought into Margie’s room to take an x-ray. Like Margie, however, he was not clear on the exact date of the incident.
Contrarily, based upon the testimony of its personnel, medical records, and expert analysis, the primary position taken by the hospital was that this incident simply did not occur. In addition, the hospital provided documentary evidence and testimony establishing when and how Margie’s left knee injury could have occurred. The secondary position taken by the hospital focused on plaintiffs’ lack of credibility regarding the event, particularly emphasizing the two conflicting Inversions of the event offered by plaintiffs: (1) a riser attached to the commode broke or came loose causing injury to Margie; (2) Margie injured herself while she got up from the wheelchair before reaching the commode.
When questioned about the alleged incident, CNA White emphatically denied any incident happened “where Mrs. McGlothlin was injured while she was under [her] care.” Furthermore, had any mistake or accident occurred, she would have reported it.
Nurse Debra Loftin, who was the nursing administrator/director of the rehab unit in May of 1999, then testified regarding her overall review of Margie’s status from a nursing and therapy perspective. Reviewing several nursing entries between May 23 and May 27, she found no specific mention of any type of incident or unexpected problem to the left knee. However, her note from June 3, 1999, which was a *1235 summary of Margie’s last several days of care, reflected that on Friday, May 28, Margie had been progressing in the gym, but developed pain in her left leg:
Friday she was standby assist with all ADLs. Bed mobility was modified independent. Transfers, independent to the bed, wheelchair, and wheelchair to bedside commode. In the gym, ambulation 150 feet with a walker. Then, pain greater in the left — the left foot and swollen, pain in the calf. Zero to 90 passive range of motion on the right; the left, unable to measure....
Additionally, Nurse Loftin read to the jury a critical occupational therapy (OT) note:
Patient able to tolerate standing up to five minutes on Friday before complaints of pain to the left knee began. Patient able to perform transfers — I’m not sure what that says here — transfers — and I think the word is “of’ beside commode with mod — modified independence to standby assist, toilets with standby assist, dresses lower extremities with standby assist using assisted equipment. Patient continues to perform upper extremity exercises at the bedside since problems with knee have risen. We will await further orders to continue.
| ^Nurse Loftin testified the note specifically referred back to Friday, May 28, as the day when left knee pain started inhibiting Margie’s mobility in rehab.
Finally, Nurse Loftin explained she prepared an Incident Report on July 14, 1999, almost a month and a half later, which she also read to the jury: “Patient ... states that on May 29th, when she was assisted to the toilet in her room, the elevated toilet seat slipped and she twisted her left knee, which was painful.” She testified she investigated the complaint, but found no specific evidence the event occurred.
Likewise, defendant’s expert in nursing, Sherry Haley, testified there was no indication from a nursing review of the charts and records the alleged incidents ever took place. ■ Regarding the specifics of the chart, Nurse Haley found the rehab notes reflected Margie’s daily progress:
5/23: The patient is minimal assist with sit to stand; 25 feet with a standard walker times two. Daily progress, the patient is moderate to minimal assist with bed to wheelchair transfer.... 5/24: Minimal assist with sit to stand; 60 feet with standard walker times two .... 5/26: 90 feet with a standard walker times two. Patient ambulated 300 feet for family with two standing rest periods.... 5/27: Participating in a.m. therapy; tolerating without difficulty.
Further according to her testimony, the OT note on May 28 said Margie was progressing that morning, but pain began in the left leg with a swollen foot and a problem with her calf. In conjunction with the OT notes, Nurse Loftin’s floor notes also reflected Margie was having pain in her left lower extremity on Friday. Rehab was suspended, and an x-ray was obtained, depicting a possible patella dislocation.
Nurse Haley also read from a note written on June 5, 1999, by Margie’s rehab physician, Dr. Frank Lopez, regarding the incident:
Patient referred to me .... she developed increased pain gradually with therapies. She again had increased pain in an episode going to the bathroom. She was taken to the handicap bathroom. The seat riser |2fifell off and she bent her knee at a painful level. Didn’t fall and was assisted to her chair by Peggy....
Finally, regarding Margie’s “memory marker” events, Nurse Haley confirmed in her testimony all of the described events were recorded in the nurse’s notes and the medication administration record as having *1236 occurred on June 2, 1999. She also testified that while she agreed Margie could have lost track of a specific calendar day, patients remember event markers. She concluded that reviewing the rehab and the floor nursing notes together shows Margie suffered a setback in rehab to her left knee on May 28.
Dr. Leonard, defendant’s expert in the field of orthopedic surgery, also reviewed Margie’s records, noting she had been disabled and wheelchair bound leading up to her May 1999 admission to the hospital and that she had had a prior patella sub-luxation [9] in 1992. Dr. Leonard found this historical fact significant, opining that with a prior history of left patella dislocation, Margie could be susceptible to such an injury again:
Well, it’s kind of like a shoulder that dislocates or a patella that dislocates. Once it happens, then you are more likely than other people to have the same thing happen to you. She had it in her left knee in 1992. And then she had it after her surgery in her left knee. The right knee apparently never had any subluxation and never had a dislocation. There is no magic there. The subluxation that Dr. Foret documented in 1992 was a precursor of what happened after the surgery when she had her total knee replacement in the same knee.
Moreover, Dr. Leonard also agreed that from May 20 through May 28, Margie had progressed in rehab and took particular note of the fact her ambulation distances got longer. Reviewing the previously discussed OT note, Dr. Leonard ^explained problems can develop in rehab, especially to a patient with Margie’s subluxation history, because patients “are being asked to do things with injured extremities that they probably ... had not done ... for a very long time.” Regarding her course of treatment on May 28, Dr. Leonard noted Margie was exercising and had been standing for five minutes. She was doing well in her exercises, but pain developed. He explained he had no doubt, given the x-ray finding, the patella dislocation, which is a known complication of knee replacement surgery, occurred on May 28 in rehab. Finding no evidence of fault, Dr. Leonard opined there was no breach in the standard of care.
In light of this testimony, it is clear the jury was presented with two conflicting but equally plausible views of how the patella dislocation occurred. On one hand, plaintiffs established through the testimonies of Nurse Joiner-Roger, Margie, and Dr. Foret the patella could have been dislocated as a result of CNA White’s malpractice in attempting to transfer Margie to the commode in the rehab bathroom. On the other hand, defendant established through the testimonies of Nurse Loftin, Nurse Haley, and Dr. Leonard, along with Margie’s voluminous medical records and history, the patella could have become dislocated as a result of Margie’s challenging rehab therapy. More significantly, the jury was also presented with two versions of what happened in the rehab bathroom, and the only two people who could have participated in the incident — Margie and CNA White — presented conflicting accounts. While Margie testified she fell when CNA White tried to transfer her to the commode, CNA White adamantly stated she never attempted such a transfer with Margie.
*1237 As evidenced by its verdict, the jury concluded the acts alleged by the plaintiffs did not occur and, therefore, the hospital did not breach the standard of care. The jury’s finding in this regard was clearly based on its decision to credit 127the testimony of defendant’s witnesses over plaintiffs’ witnesses. Where, as here, there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong, and reasonable evaluations of credibility and inferences of fact should not be disturbed upon review. Rosell, 549 So.2d at 844. Therefore, after considering the record as a whole, we find a reasonable factual basis exists to support the jury’s determination that defendant did not breach the standard of care because Margie’s injury did not occur as alleged. Accordingly, we find no manifest error in the jury’s determination.
CONCLUSION
In summary, we find the medical review panel opinion in this matter is not subject to mandatory admission under La.Rev. Stat. § 40:1299.47(H) because it does not constitute an expert opinion as defined by La.Rev.Stat. § 40:1299.47(G). Moreover, because the panel superseded its authority and based its opinion on its decision to discredit the testimony and evidence presented by plaintiffs, its opinion invaded the province of the jury and is inadmissible. However, any error in its admission was rendered harmless by the District Court’s redaction of the offending language and because the evidence contained in the edited opinion was corroborative and cumulative of other properly admitted evidence. Therefore, although we find the Court of Appeal did not err in finding the opinion inadmissible, we find the appellate court did err in finding its admission tainted the integrity of the trial and in its de novo review. Finally, after reviewing the entirety of the record for manifest error, we conclude, in light of the evidence presented in this case, the jury could have reasonably found defendant did not breach the standard of care in its treatment of Margie because it reasonably believed Margie’s injury did not occur as alleged. Consequently, we reversed the judgment of the | asCourt of Appeal and reinstate the judgment of the District Court, rendered in conformity with the jury’s verdict.
DECREE
For the foregoing reasons, the judgment of the Court of Appeal is hereby reversed and the judgment of the District Court is reinstated.
REVERSED; DISTRICT COURT JUDGMENT REINSTATED.
JOHNSON, Justice, concurs in part, dissents in part and assigns reasons.
GUIDRY, Justice, concurs.

. Her medical history included morbid obesity, asthma, prior right knee medial meniscus tear, right knee arthroscopy, left patella sub-luxation, degenerative arthritis, hypothyroidism, and deep vein thrombosis. At the time of her admission, Margie was 58 years of age and weighed approximately 300 lbs. She was also disabled and wheelchair bound prior to surgery.

. Dr. Foret explained the physiology of knee replacement surgery at trial:
The incision is made into the femur and the proximal end of the tibia are exposed. Those cuts — you have special instruments that you put on the knees ... to make specific cuts to resurface the joint. Then you essentially cap the femur and cap the tibia and have a space between. Then you work a portion of the kneecap as well.... It gets a patella button. About half of the kneecap is removed, and the other half is a patella button that you put on it. So, you have a metal to polyethylene surface where the kneecap fits in between.

. Notably, Beaucoudray merely involved an unsubstantiated technical defect in the panel opinion, which did not rise to the level of the substantive defect in the present case or in the previously cited circuit cases.

. Analogously, our jurisprudence has recognized that in certain situations expert testimony regarding the applicable standard of care, its breach, and causation is not necessary for a medical malpractice plaintiff to meet his burden of proof. See Schultz v. Guoth, 10-0343, pp. 7-8 (La. 1/19/11), 57 So.3d 1002, 1007; Samaha, 07-1726 at p. 6, 977 So.2d at 884; Pfiffner v. Correa, 94-0924, pp. 1-2 (La. 10/17/94), 643 So.2d 1228, 1230. In those instances, we have recognized the medical and factual issues are such that the jury can infer negligence in the health care provider’s conduct as well as any expert could, i.e., "the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony.” Samaha, 07-1726 at p. 6, 977 So.2d at 884; see also Pfiffner, 94-0924 at pp. 1-2, 643 So.2d at 1230.

. Further, plaintiffs’ counsel withdrew any question regarding Dr. Leonard's or the panel's credibility determinations because he did not want to open a door that would allow defense counsel to question the witness on redirect concerning those issues.

. This decision was superseded on other grounds by an amendment to La.Rev.Stat. § 23:1032 as recognized in Walls v. American Optical Corp., 98-0455, p. 3 (La.9/8/99), 740 So.2d 1262, 1265.

. As made clear from Oral Argument, no one disputes the record does not support a finding of causation as to this allegation, and therefore, we will not discuss the evidence concerning the first incident, but rather will focus solely on the second incident.

. Dr. Foret explained:
if you look at your own knee, it goes down from the femur and it goes to the outside; and that’s called — that’s a valgus positioning of the knee. And the kneecap is made to fit in about a 7 degree groove, 7 degree alignment; but if the foot goes out away from the body further and the muscle contracts and it can pull that kneecap off to the side. And ... the kneecap is still attached to a tendon above and below. So, it is not free floating. It is actually part of the — the tendon complex that pops it’s over then you can pop back into place.

. Dr. Leonard explained:
Subluxation of the joint means that the joint was part of the way out of place. So, it goes off to the side. In the knee it would go off to the outside 99 times out of a hundred. A dislocation is when the joint loses — the two bones lose contact and the joint is not in contact anymore. So, a sub-luxation is a partial dislocation. A dislocation, you lose all continuity in the joint.