NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1152

CAMI LINDGREN, ET UX.

VERSUS

JOHN T. NING, M.D., ET AL.

**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 74,568 DIV. B
HONORABLE JOHN C. FORD, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and James T. Genovese, Judges.

**AFFIRMED.**

**Marc W. Judice**
**H.L. Tuten III**
**Judice & Adley**
**P. O. Drawer 51769**
**Lafayette, LA 70505-1769**
**(337) 235-2405**
**Counsel for Defendants/Appellees:**
      **Dr. John T. Ning**
      **LAMMICO**

**R. Scott Iles**
**Attorney at Law**
**P. O. Box 3385**
**Lafayette, LA 70502**
**(337) 234-8800**
**Counsel for Plaintiffs/Appellants:**
    **Cami Lindgren**
    **Gordon Lindgren**

**PICKETT, Judge.**

Plaintiffs, husband and wife, in this medical malpractice suit appeal the jury's determination that the defendant physician was not negligent in his treatment of the wife. We affirm.

## FACTS

Cami Lindgren sought treatment with Dr. John Ning, a urologist in Leesville, after her bladder was nicked during a hysterectomy performed by another physician. Mrs. Lindgren presented to Dr. Ning on August 22, 2002, complaining of painful urination, frequent urination, hematuria or blood in her urine, and pain. She reported to Dr. Ning that after her hysterectomy, she began having issues with urinary frequency and urgency, pelvic pain, blood in her urine, fever, pain during urination, back pain, and recurrent urinary tract infections. Mrs. Lindgren was treated by Dr. Ning from August 22, 2002 through May 3, 2003. During her course of treatment, Dr. Ning implanted a medical device known as InterStim Therapy (InterStim), manufactured by Medtronic, in Mrs. Lindgren's lower back in an attempt to alleviate her problems with urinary urgency and frequency.

In March 2003, the Louisiana State Board of Medical Examiners (Board) took disciplinary action against Dr. Ning that resulted in his agreeing to voluntarily surrender his medical license as of August 19, 2003. In the disciplinary action, the Board made allegations of Dr. Ning (1) employing deceit, perjury, false testimony, and false information; (2) being professionally or medically incompetent; (3) failing to satisfy the prevailing and usually accepted standards of medicine; and (4) knowingly assisting an unlicensed person in the practice of medicine.

Mr. and Mrs. Lindgren instituted a medical review panel proceeding, asserting claims of medical malpractice against Dr. Ning. The panel concluded Dr. Ning's treatment of Mrs. Lindgren did not fall below the applicable standard of care, and they sued Dr. Ning, seeking damages. A jury trial was held at which the Lindgrens testified and presented the expert testimony of a urologist, Dr. William Kubricht III, who testified that Dr. Ning's treatment of Mrs. Lindgren fell below the standard of care in two respects. Dr. Ning testified in his defense and supported his defense with the testimony of two urologists, Dr. Alexander Gomelsky and Dr. Kenneth Verheek, who opined that his treatment of Mrs. Lindgren was reasonable under the circumstances.

The jury voted nine to three in favor of Dr. Ning, finding that he was not negligent. After a judgment in accordance with the jury's verdict was signed by the trial court, the Lindgrens filed a Motion for New Trial or, in the alternative, Motion for Judgment Notwithstanding the Verdict, which the trial court denied. Thereafter, they perfected this appeal.

## ASSIGNMENTS OF ERROR

The Lindgrens assert three assignments of error:

> (1) The trial court erred in deleting significant elements of the cross-examination testimony of Dr. Ning.

> (2) The trial court erred in deleting applicable portions of the cross-examination of medical review panelist Dr. Gomelsky.

> (3) The trial court erred in denying the post-trial motions, including the motion for new trial or, in the alternative, motion for judgment notwithstanding the verdict.

## DISCUSSION

When Mrs. Lindgren began her treatment with Dr. Ning, she presented with a complicated medical situation. She complained of painful urination, frequent

urination, blood in her urine, and pain. In addition to her urinary problems, Mrs. Lindgren indicated on a patient questionnaire that she was not satisfied with life and was severely depressed.

Dr. Ning initially treated Mrs. Lindgren conservatively in an attempt to relieve her bladder problems. After a short time, he implanted the InterStim to help her bladder to function properly. As required by the Food and Drug Administration, he first implanted a test device to see if it provided Mrs. Lindgren any relief. Finding that the device improved Mrs. Lindgren's symptoms, Dr. Ning proceeded to implant a permanent device.

Dr. Ning's notes indicate that the InterStim provided her relief from her bladder symptoms. In stark contrast, Mrs. Lindgren testified that although the test InterStim provided her three or four days of relief, the permanent InterStim did not provide her relief. She specifically denied telling Dr. Ning that the permanent InterStim worked, as he noted in his records. To the contrary, she related that the permanent device randomly shocked her and, on occasion, would cause her big toe, vagina area, or rectum to convulse.

After Dr. Ning closed his office, Mrs. Lindgren was treated by Dr. Chuen Kwok in Leesville. Her complaints to Dr. Kwok were similar to the complaints she made to Dr. Ning; however, she reported to Dr. Kwok on April 23, 2003, that the InterStim improved her symptoms. In July 2003, Mrs. Lindgren sought treatment from Dr. Kubricht. When he treated Mrs. Lindgren, Dr. Kubricht was the chief of female urology and reconstructive pelvic surgery at Louisiana State University Medical Center-Shreveport. He recommended that she have the InterStim removed. While Mrs. Lindgren was treating with Dr. Kubricht, her husband was transferred to Fort Knox, Kentucky. Mrs. Lindgren's treating

urologist at Fort Knox taught her to catheterize herself, which Mrs. Lindgren related "works great" and provides her "great relief."

In their case, the Lindgrens presented the testimony of Dr. Kubricht to establish that Dr. Ning's use of the InterStim was below the standard of care because he failed to treat Mrs. Lindgren conservatively with medications and behavior therapy for a longer period of time before implanting the InterStim. They also sought to prove that Dr. Ning's treatment after he implanted the device was below the standard of care.

Dr. Kubricht testified that Dr. Ning's treatments of irrigating the bladder and instilling it with antibiotics and pain medication were unusual for a patient with Mrs. Lindgren's symptoms. He found it very unusual to recommend InterStim as early in a patient's treatment as Dr. Ning did for Mrs. Lindgren and opined that Dr. Ning's treatment fell below the standard of care because he did not prescribe antispasmodic drugs for Mrs. Lindgren on a consistent basis before implanting the InterStim. Dr. Kubricht further testified that Dr. Ning's treatment after the device was implanted made it hard to determine whether the device had any impact on Mrs. Lindgren's symptoms. He explained that Dr. Ning's notes, indicating the device provided Mrs. Lindgren relief, were at odds with his actual treatment, which included repeated bladder irrigations, instillations of the bladder with Marcaine, and prescriptions for Lortab and Phernergan. Dr. Kubricht testified that continued use of these drugs indicated that Mrs. Lindgren had significant pain.

On cross-examination, Dr. Kubricht was impeached with an earlier report he had prepared in which he stated that physicians who strongly support use of the InterStim, go straight to the InterStim with minimal use of the conservative therapy he recommended. Additionally, when asked whether Dr. Gomelsky's and the

other medical review panel members' opinions that Dr. Ning's management of Mrs. Lindgren was within the standard of care were reasonable, Dr. Kubricht responded, "I think Dr. Gomelsky is more than able to come to that term." Dr. Kubricht also testified that InterStim treats some of Mrs. Lindgren's symptoms–frequency, urgency, and bladder spasms–but not pain and blood in the urine.

Drs. Gomelsky and Verheek both testified they had experience with InterStim. They explained that Dr. Ning had a complex set of problems to address with Mrs. Lindgren and that his attempts to address her problems were reasonable under the circumstances. Dr. Gomelsky reviewed Dr. Ning's treatment of Mrs. Lindgren and testified that while he tends to try a couple of different medications for a period of four to six weeks before using InterStim, much depends on the patient, how she feels, and what previous treatments have been attempted.

On cross-examination, Dr. Gomelsky pointed out that Dr. Ning's move to treating Mrs. Lindgren with the InterStim was five months and five days after the initial injury to her bladder during the hysterectomy. Lastly, he pointed out that the number of visits Mrs. Lindgren had per month with Dr. Ning after the InterStim was implanted was almost reduced by half as compared to the number of visits she had per month before it was implanted.

Dr. Verheek's testimony showed that he had thoroughly reviewed Mrs. Lindgren's medical records. He disagreed with Dr. Kubricht that Dr. Ning did not take enough conservative measures before implanting the InterStim, explaining that Dr. Ning used the only medications available at the time to treat bladder problems in his treatment of Mrs. Lindgren. He opined that a uroflow test

5

Dr. Ning performed on Mrs. Lindgren in September 2002, which showed her bladder was slow emptying, supported the InterStim. Dr. Verheek's review of Dr. Ning's operative report indicated to him that Dr. Ning had the skill and knowledge to perform the procedure.

Dr. Verheek opined that in addition to her complaints of pelvic pain, continued infections, and hematuria that she had before seeing Dr. Ning, Mrs. Lindgren developed interstitial cystitis, a chronic and painful condition of the bladder, when her bladder was nicked. He testified that there is no cure for this condition, that its symptoms can increase during treatment, and that the disease can be debilitating. Dr. Verheek testified that none of Dr. Ning's treatment would have aggravated or increased Mrs. Lindgren's symptoms and that his care of her was within the standard of care. He did admit, however, that there was a disconnect without his hearing Mrs. Lindgren's testimony and relying on Dr. Ning's records in light of his suspension from medical practice.

### Did the trial court err in deleting significant elements from the cross-examination of Dr. Ning?

Dr. Ning did not attend the trial; his trial deposition was videotaped and shown to the jury. The Lindgrens complain the trial court erred in excluding twelve pages of his deposition from presentation to the jury. The excluded testimony pertains to Dr. Ning's leaving the general surgery residency at the Medical University of South Carolina to attend the urology residency at Brown University, to the representation on his curriculum vitae that his service in the Public Health Services, a branch of the uniformed service of the United States, was military service, when it was not, and what InterStim training he received prior to his implantation of Mrs. Lindgren's InterStim device.

6

As part of their argument, the Lindgrens assert that Dr. Ning was not tendered as an expert during his trial deposition and that the excluded testimony shows his testimony is baseless. To the contrary, Dr. Ning was tendered as an expert in urology during his trial deposition. Counsel for the Lindgrens, however, did not challenge Dr. Ning's credentials. Accordingly, Dr. Ning testified as an expert in urology. *Hayne v. Woodridge Condos., Inc.*, 06-923 (La.App. 4 Cir. 4/11/07), 957 So.2d 804.

The Lindgrens also contend the excluded testimony shows Dr. Ning lied regarding the grounds under which left the general surgery residence at the Medical University of South Carolina. In the excluded testimony, Dr. Ning testified that he left the general surgery residency for a urology residency at Brown University because the general surgery residence was a demanding five-year program, while the urology residency was two-year program.

Counsel for the Lindgrens attempted to impeach Dr. Ning's explanation of why he left the general surgery residency with testimony from his discovery deposition that referenced hazing in that residency. They contend this attempt at impeachment shows Dr. Ning lied. First, as explained by the trial court, counsel did not follow the proper procedure for impeachment. Second, the testimony does not show Dr. Ning lied.

Counsel questioned a statement made by Dr. Ning in his discovery deposition in which he referenced hazing, asking, "Did you quit the program because of hazing?" Dr. Ning responded that he left the program to enter a specialty program, urology. Dr. Ning's statement in his discovery deposition was, "What I saw was hazing." The excluded testimony does not establish, or even

7

imply, that Dr. Ning lied about his reason for leaving the general surgery residency.

The Lindgrens also urge a portion of the excluded testimony shows Dr. Ning made an "early departure (AWOL) from his military obligation." Dr. Ning's curriculum vitae showed that he worked for Public Health Service for a period of time at a hospital in Alaska. He indicated thereon that his work for the Public Health Service was "military service" but admitted in his deposition that the service was not military service. He explained, however, that service in the Public Health Service is "a uniformed service, [as] the Commission Corps of the Public Health Service [is] operated under the Department of Defense."

Continued questioning segued into whether Dr. Ning received InterStim training in Alaska. Dr. Ning explained that he worked in Alaska before he attended Brown University for his urology residency and that his work in Alaska was not training. Counsel continued his questioning, stating he wanted to confirm that Dr. Ning had not received InterStim training through his formal education or through his training in the hospitals at which he had worked. In response, Dr. Ning further explained that he did not receive any training in the hospitals at which he had worked.

Dr. Ning's trial testimony established that he learned about InterStim implantation at programs and seminars he attended after his residency. Additionally, Drs. Ning, Gomelsky, and Verheek testified that before any doctor can perform InterStim implants, MedTronic requires him to be proctored by a doctor qualified by MedTronic who verifies the training doctor can properly perform the test implant and the permanent implant. Accordingly, the evidence established InterStim training is provided by MedTronic, not by educational or

8

training institutions. Furthermore, Dr. Kubricht's testimony did not dispute this evidence.

Trial courts are afforded broad discretion regarding the admissibility of evidence. *Williams v. Lafayette City-Parish Consol. Gov't*, 11-281 (La.App. 3 Cir. 10/5/11), 72 So.3d 1023. Unless an abuse of discretion is shown, a trial court's decision to exclude evidence will not be reversed. *Id.* We find no error with the trial court's exclusion of Dr. Ning's testimony as to why he left the Medical University of South Carolina because the excluded testimony does not show that Dr. Ning lied in any respect. We also find no error with the trial court's exclusion of the testimony regarding Dr. Ning's training on InterStim implantation, as the information sought was provided at trial by Drs. Ning, Gomelsky, and Verheek. Additionally, to the extent that Dr. Ning's representation on his curriculum vitae that his work for the Public Health Service was military service called his credibility into question, the Board's representations in the disciplinary action taken against Dr. Ning clearly established that Dr. Ning's credibility was highly questionable. Therefore, any error in this regard was harmless.

As part of their argument, the Lindgrens also contend Dr. Ning's failure to respond to discovery they propounded to him after the trial court ordered him to respond to the discovery warranted the excluded testimony being presented to the jury. Article 1471 of the Louisiana Code of Civil Procedure provides that trial courts can sanction a disobedient party's refusal to respond to discovery by dismissing the party's suit or defaulting the party. *Lasseigne v. Gerald E. Landry, L.L.C.,* 11-584 (La.App. 3 Cir. 12/14/11), ___ So.3d ___. The Lindgrens did not seek this relief from the trial court, and their attempts to sanction Dr. Ning for his

failure and/or refusal to respond to the requested discovery in this manner are improper.

For these reasons, the Lindgrens' assignment of error regarding the trial court's exclusion of portions of Dr. Ning's testimony lacks merit.

***Did the trial court err in deleting portions of the cross-examination of Dr. Alexander Gomelsky, a medical review panelist?***

The Lindgrens argue the trial court's exclusion of a portion of Dr. Gomelsky's testimony constitutes reversible error pursuant to a motion in limine filed by Dr. Ning. When examining Dr. Gomelsky as to his qualifications as an expert, the Lindgrens' attorney asked Dr. Gomelsky if he knew Dr. Kubricht's qualifications as an expert. In the excluded testimony, Dr. Gomelsky acknowledged that he knew Dr. Kubricht's qualifications, that Dr. Kubricht was his predecessor at Louisiana State University Medical Center-Shreveport, and that they are experts in the same field.

We find no error in the trial court's exclusion of this segment of Dr. Gomelsky's testimony. Dr. Gomelsky's knowledge of Dr. Kubricht's qualifications and his recognition of him as an expert are irrelevant. In its role as the trier of fact, the jury determined the weight of Dr. Kubricht's expertise as compared to the other experts who testified and whether to accept or reject any of his opinion. *McGlothlin v. Christus St. Patrick Hosp.*, 10-2775 (La. 7/1/11), 65 So.3d 1218. Moreover, other than acknowledging that he and Dr. Kubricht are experts in the same field, Dr. Gomelsky's testimony did not provide the jury any more information than Dr. Kubricht's testimony regarding his qualifications did.

The trial court also excluded Dr. Gomelsky's response to a question which asked if he agreed that a certain action "would not be what most urologists would

10

be considering." Pursuant to La.R.S. 9:2794(1) and (2), the Lindgrens had to prove Dr. Ning "either lacked [the] degree of knowledge or skill [practiced by physicians within urology] or failed to use reasonable care and diligence, along with his best judgment in the application of that skill." The trial court determined this question was irrelevant. We agree. It does not address whether Dr. Ning "failed to use reasonable care and diligence." Moreover, Dr. Gomelsky's answer was not responsive to the question. His response addressed what his considerations were in light of the referenced test results, not what "most urologists would be considering."

**Did the trial court err in denying Plaintiffs' Motion for New Trial or, in the alternative, Motion for Judgment Notwithstanding the Verdict?**

In their last assignment of error, the Lindgrens argue the trial court erred in denying their post-trial motions in which they sought a new trial or JNOV. In support of this assignment of error, the Lindgrens discuss the legal requirements for the grant of a directed verdict as provided in La.Code Civ.P. art. 1810. They do not address the legal requirements for proving a new trial or a JNOV should be granted, nor do they outline any facts which prove they are entitled to either remedy. For these reasons, we consider this assignment of error abandoned and do not address it. *See* Uniform Rules−Courts of Appeal, Rule 2-12.4.

## DISPOSITION

The judgment of the trial court is affirmed. All costs of this appeal are assessed to Cami and Gordon Lindgren.

**AFFIRMED.**

11