| | | |
|---|---|---|
| HERO LANDS COMPANY, L.L.C. | * | NO. 2023-CA-0269 |
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| CHEVRON U.S.A. INC.; | | FOURTH CIRCUIT |
| TOTAL PETROCHEMICALS | * | |
| & REFINING USA, INC.; | | STATE OF LOUISIANA |
| PIONEER NATURAL | * * * * * * * | |
| RESOURCES, INC.; KEY | | |
| OPERATING & PRODUCTION | | |
| COMPANY, L.L.C.; KEY | | |
| EXPLORATION COMPANY; | | |
| WAGNER OIL COMPANY; | | |
| HILCORP ENERGY I, L.P.; | | |
| MANTI OPERATING | | |
| COMPANY; AND | | |
| HENDERSON OIL COMPANY, | | |
| INC. | | |

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 64-320, DIVISION "A"
Honorable Kevin D. Conner, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Paula A. Brown, Judge Dale N. Atkins, Judge Nakisha Ervin-Knott)

James R. Swanson
H.S. Bartlett, III
Lance C. McCardle
E. Blair Schilling
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170

Gladstone N. Jones, III
Bernard E. Boudreaux
Kevin E. Huddell
Michael P. Arata
John T. Arnold
Rosa E. Acheson
JONES SWANSON HUDDELL LLC
601 Poydras Street, Suite 2655
New Orleans, LA 70130

S. Jacob Braud
BALLAY, BRAUD & COLON, PLC
8114 Highway 23, Suite 101
Belle Chasse, LA 70037

COUNSEL FOR PLAINTIFF/APPELLANT, Hero Lands Company, L.L.C.


Michael R. Phillips
Claire E. Juneau
Jeffrey J. Gelpi
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112

L. Victor Gregoire, Jr.
Richard D. McConnell, Jr.
John C. Funderburk
KEAN MILLER LLP
400 Convention Street, Suite 700
Baton Rouge, LA 70802

Robert E. Meadows (pro hac vice)
Tracie J. Renfroe (pro hac vice)
Elizabeth R. Taber (pro hac vice)
Mitchell B. Bryant (pro hac vice)
KING & SPALDING LLP
1100 Louisiana, Suite 4100
Houston, TX 77002

Martin A. Stern
Raymond P. Ward
Alexandra Roselli Lamb
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

COUNSEL FOR DEFENDANT/APPELLEE, Chevron U.S.A. Inc.


**AFFIRMED**
**DECEMBER 7, 2023**

DNA

PAB

NEK

This civil case concerns a plan formulated under La. R.S. 30:29 ("Act 312")[1] for the evaluation and remediation of environmental damage on a certain piece of property as necessitated by decades of oil and gas operations on the property. Appellant, Hero Lands Company, L.L.C. ("Hero"), owns the subject property and seeks review of the trial court's October 24, 2022 judgment, which granted the "Motion to Adopt Most Feasible Plan" ("Motion to Adopt") filed by Appellee, Chevron U.S.A., Inc. ("Chevron"), regarding the plan structured and approved by the Louisiana Department of Natural Resources ("LDNR"). For the following reasons, we affirm.

**RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This case concerns the contamination of approximately 155 acres of property owned by Hero in Plaquemines Parish resulting from oil and gas operations performed, in part, by Chevron's predecessor. The property is divided into four tracts, namely the Southeast, Southwest, Northeast, and Northwest Tracts.

---

[1] Louisiana Revised Statutes 30:29 is titled "Remediation of oilfield sites and exploration and production sites" and is commonly referred to as "Act 312." Thus, textual sentences in this Opinion will use "Act 312," and citations will be to La. R.S. 30:29.

1

This matter has already been before this Court on appeal twice this year.[2] On the first of those occasions, this Court rendered an Opinion on March 7, 2023, wherein the Court summarized the relevant factual and procedural background as follows:

**Factual Background**

Hero's predecessor and Chevron's predecessor entered into multiple leases beginning in 1939[3] in order to develop oil and gas natural resources on Hero's Property. . . .

. . . .

Hero was aware of potential environmental damage on the Property as early as 1989. At that time, Hero obtained an environmental site assessment report from another surface lessee concerning a portion of the Property. In 1995, Chevron Chemical Company provided Hero with "data and testing results" from a "surface and subsurface investigation" that indicated "topographic irregularities" and "elevated levels of chromium, barium, and sodium" as well as "total petroleum hydrocarbons" and "chloride in the soil samples collected from the areas where the surface" of the Property "appeared stressed." Hero subsequently obtained independent laboratory reports concerning potential environmental pollution on the

_____

[2] Neither of the prior appeals concerned the same legal issues that are present in the matter *sub judice*. Hero filed the first appeal regarding the trial court's partial final judgment, which was entered in accordance with a jury verdict. The jury found that one of the four tracts of land on the subject property (the Northwest Tract) did not contain any environmental damage under Act 312; and the jury further found that Chevron did not operate excessively or unreasonably on any of the four tracts on the property. (Under Act 312, a landowner can pursue private claims for "[t]he cost of evaluating, correcting or repairing environmental damage upon a showing that such damage was caused by unreasonable or excessive operations." La. R.S. 30:29 (H)(1) and (M)(1)(c).)

Chevron filed the second appeal. After the aforementioned jury trial on the merits, Hero filed a motion to fix attorney's fees and costs, and the trial court granted the motion, in part. Chevron contended that the trial court erred in failing to limit its award of attorney's fees and costs regarding the fees and costs incurred by Hero in its unsuccessful pursuit of private damages claims, as well as those incurred by Hero in pursuit of claims against co-defendants who either settled or were dismissed.

[3] We note that elsewhere in the record presently before us, the year is listed as 1940.

Property as early as 2004, with other independent test results and studies occurring in 2007.

**Procedural History**

> In Hero's petition [for damages,[4]] Hero alleged that the Property incurred substantial harm due to Defendants'[5] conduct and asserted both tort and breach of contract claims. Hero expressly acknowledged the possibility that Act 312 [codified at La. R.S. 30:29] applied to the instant suit, as Hero requested remediation damages pursuant to Act 312 as well as all costs, expenses, and reasonable attorneys' fees in accordance with Act 312.

*Hero Lands Co. v. Chevron U.S.A. Inc.*, 2022-0224, pp. 3, 5 (La. App. 4 Cir. 3/7/23), 359 So.3d 130, 135-36 ("*Hero I*") (footnote omitted).

Thereafter, on May 22, 2023, this Court rendered another Opinion in this matter and provided the following update to the factual and procedural background:

> This Court provided a detailed factual and procedural history of the underlying environmental pollution case in the prior, related appeal, *Hero* [*I*]. As discussed in *Hero I*, in March 2018, Hero filed a petition for damages against Chevron, and several other defendants, seeking remediation damages for environmental damage to four certain tracts of land, as provided for by Act 312. Hero also alleged private causes of action, outside the scope of Act 312, for which it sought private damages.

---

[4] According to the record, Hero filed its initial Petition for Damages on March 5, 2018; and Hero filed an Amended Petition for Damages on October 31, 2018.

[5] Hero filed suit against: (1) Chevron; (2) Total Petrochemicals & Refining USA, Inc.; (3) Pioneer Natural Resources, Inc.; (4) Key Operating & Production Company, L.L.C.; (5) Key Exploration Company; (6) Wagner Oil Company ("Wagner"); (7) Hilcorp Energy I, L.P. ("Hilcorp"); (8) Manti Operating Company; and (9) Henderson Oil Company, Inc.

Because this appeal concerns Chevron's limited admission of liability, which is discussed more fully throughout this Opinion, as well as Chevron's Motion to Adopt, Chevron is the only one of the defendants who is a party to this appeal.

After more than two years of litigation, on July 29, 2020, Chevron entered a limited admission of liability as to three of the four tracts of land, pursuant to La. R.S. 30:29(C), thereby admitting responsibility for environmental damage on those tracts of land but not for any claims of private damages.[6] In accordance with La. R.S. 30:29(C), Chevron's limited admission of liability for environmental damage was referred to the Louisiana Department of Natural Resources ("LDNR") for administrative proceedings to develop . . . a "most feasible plan" ("MFP"[7]) for remediation of the environmental damage to which Chevron admitted responsibility.

For several months after the referral of Chevron's limited admission to the LDNR, the parties followed statutory procedures for the development of the MFP, including the submission of a proposal by Chevron, a response by Hero, responses to further inquiries from the LDNR, and a public hearing before the LDNR. In December 2020, the parties participated in a five-day public, evidentiary hearing, at which the LDNR heard testimony of eight witnesses. After the hearing, both parties filed post-hearing briefs, oppositions, and supplemental briefs. On April 7, 2021, the LDNR submitted to the trial court the proposed MFP and written reasons as required by La. R.S. 30:29(C)(2). The MFP addresses the remediation of the environmental damage only to the three tracts of land to which Chevron admitted liability.

*Hero Lands Co. v. Chevron U.S.A. Inc.*, 2022-0383, pp. 3-4 (La. App. 4 Cir. 5/22/23), ___ So.3d ___, 2023 WL 3579049, at *1-2 ("*Hero II*"), *writ granted in part*, 2023-01050, p. 1 (La. 10/10/23), 370 So.3d 1062, 1062-63.[8] This appeal concerns that most feasible plan adopted by LDNR ("LDNR MFP") mentioned in the above excerpt from *Hero II*.

_____

[6] Chevron entered this limited admission of liability concerning the Southeast, Southwest, and Northeast Tracts but not the Northwest Tract.

[7] This Opinion will also use the acronym "MFP" when referring to the phrase "most feasible plan."

[8] After this Court rendered the Opinion in *Hero II*, Chevron filed a writ application with the Louisiana Supreme Court. On October 10, 2023, the Louisiana Supreme Court granted Chevron's writ in part and remanded the matter to this Court. On remand, this Court issued another Opinion on November 9, 2023, remanding the matter to the trial court with instructions.

4

***Chevron's "Limited Admission [of Liability] Pursuant to La. R.S. 30:29"***

As explained in *Hero II*, Chevron entered a "Limited Admission [of Liability] pursuant to La. R.S. 30:29" ("Limited Admission"), which stated, in pertinent part:

> 7. When a plaintiff alleges "environmental damage" in a lawsuit, a defendant may make a limited admission under Act 312 for the environmental damage and thus take "responsibility for implementing the most feasible plan to evaluate, and if necessary, remediate all or a portion of the contamination" to applicable regulatory standards. La. [C.C.P.] art[.] 1563(A).[9]
>
> 8. When a defendant makes a limited admission, the [LDNR] must hold a public hearing to determine the "most feasible plan" to evaluate or remediate the environmental damage under applicable regulatory standards. La. [C.C.P.] art[.] 1563(A)(2).
>
> . . . .
>
> 12. Chevron admits that "environmental damage" as defined by Act 312 exists in portions of the soil and groundwater on [Hero]'s property within the [the Southeast, Southwest, and Northeast Tracts].
>
> 13. Chevron admits that it is a "responsible party" under Act 312 to evaluate and if necessary, remediate to applicable regulatory standards any environmental damage on [Hero]'s property . . . which was caused by Chevron's operations. . . .

Further, as explained in *Hero II* and in Chevron's Limited Admission, after Chevron entered its Limited Admission, this triggered a series of administrative and judicial proceedings. At the outset, as required by Act 312, the trial court handed down an order on July 31, 2020, which stated, in pertinent part:

> Considering Chevron U.S.A. Inc.'s ("Chevron") Limited Admission Pursuant to La. R.S. 30:29 and Chevron's Motion for Referral to the Louisiana Department of Natural Resources for the Development of the Most Feasible Plant [sic] Pursuant to La. R.S. 30:29

---

[9] Louisiana Code of Civil Procedure Article 1563 is titled "Limited admission of liability in environmental damage lawsuits; effect." It is discussed more fully throughout this Opinion.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

. . . .

(2)  Chevron's limited admission is limited to the "responsibility for implementing the most feasible plan *to evaluate, and if necessary, remediate* all or a portion of the contamination that is subject to the litigation to applicable regulatory standards" on the property . . .

. . . .

(4)  Chevron shall develop a plan for the *evaluation or remediation* of "environmental damage" as provided in La. R.S. 30:29(C) to applicable standards of the contamination that resulted in environmental damage to the . . . property;

(5)  Chevron's plan, as described above, shall be developed and submitted to the [LDNR] by certified mail with return receipt requested and Chevron shall file such plan with the Court on August 24, 2020;

(6)  Plaintiff or any other party shall have thirty (30) days from the date Chevron's plan is filed with the Court to review the plan and submit or provide to the [LDNR] and the Court comments, input, and/or its own plan in response to Chevron's Plan;

. . . .

(8)  Any further proceedings with respect to the plan submitted by Chevron, the [LDNR], Plaintiff, or any other party, shall be conducted pursuant to the procedures set forth in La. R.S. 30:29.

(Emphasis added.)[10]

---

[10] Following an admission of liability, Act 312 requires the following statutory procedures:

C. (1) If at any time during the proceeding a party admits liability for environmental damage . . ., the court shall order the party or parties who admit responsibility . . . to develop a plan or submittal for the evaluation or remediation to applicable regulatory standards of the contamination that resulted in the environmental damage. The court shall order that the plan be developed and submitted to the

6

Thereafter, as ordered by the trial court, Chevron submitted its proposed plan to LDNR,[11] as well as all data collected by both Chevron and Hero; and Chevron also responded to a request for clarification from LDNR on October 8, 2020.[12] Additionally, on October 30, 2020, Hero submitted a response to Chevron's plan but did not submit its own plan to LDNR. LDNR then conducted a five-day hearing on Chevron's proposed plan in December 2020.[13]

At the hearing, LDNR employees who had "relevant technical background" constituted the hearing panel, namely Jamie C.T. Love, Petroleum Scientist Manager, Groundwater Resources Program ("Ms. Love"); Christopher Delmar, Petroleum Scientist Supervisor Exploration & Production Waste Management/Legacy Site Remediation; Stephen Olivier, Petroleum Scientist Manager, Exploration & Production Waste Management/Legacy Site Remediation; and Abigail Toohey, Petroleum Scientist, Exploration & Production Waste, Management/Legacy Site Remediation. The panel heard testimony from seven

---

department and the court within a time that the court determines is reasonable and shall allow the plaintiff or any other party at least thirty days from the date each plan or submittal was made to the department and the court to review the plan or submittal and provide to the department and the court a plan, comment, or input in response thereto.

[11] We note that the trial court's July 31, 2020 order required Chevron to submit its proposed plan by August 24, 2020. According to the record, Chevron did not submit its plan until September 9, 2020.

[12] This timeline is outlined in the LDNR MFP, which is discussed in the next section.

[13] Act 312 states that "[w]ithin sixty days from the last day on which any party may provide the department with a plan, comment, or response to a plan . . ., the department shall conduct a public hearing on the plan or plans submitted." La. R.S. 30:29(C)(2)(a).

The LDNR hearing occurred on December 14, 2020; December 16-18, 2020; and December 21, 2020.

witnesses offered by Chevron and one witness offered by Hero. Further, Chevron and Hero submitted post-hearing briefs and supplemental post-hearing briefs to LDNR.

***LDNR MFP***

Ultimately, LDNR "decided to partially approve the" plan submitted by Chevron but "structur[ed] a plan which it [found] to be the most feasible plan" under the "meaning of La. R.S. 30:29(C)." This was the aforementioned LDNR MFP as discussed in *Hero II*; and it is titled "Louisiana Department of Natural Resources, Office of Conservation Most Feasible Plan and Written Reasons in Support as Required by La. R.S. 30:29." The LDNR MFP stated that it "was developed using information provided by both parties." Additionally, the LDNR MFP noted that LDNR consulted with the Louisiana Department of Environmental Quality when necessary. The LDNR MFP required Chevron to perform remediation and treatment of soil in certain areas, additional investigation and testing in specified areas, and groundwater monitoring.

Of note, the LDNR MFP observed, in multiple sections, the need for additional delineation and sampling. For example, the LDNR MFP stated:

> **A. SOIL**
>
> Conservation will be partially accepting the Chevron Plan. There is no objection to the proposed remediation and treatment of the areas proposed by Chevron. However, some of these areas are not fully delineated and require more information to determine the full extent of potential contamination. Conservation will be requiring further delineation of specified areas, review of former pit areas, and the assessment of the drainage ditch present on the property.
>
> . . . .
>
> The Agency has deemed it necessary for Chevron to perform soil sampling in the four pits located in the [Southeast] Tract and the three pits in the [Southwest] Tract that were not previously sampled. . . .

Representative soil samples are to be collected and analyzed in accordance with [Statewide Order] 29-B [("29-B")] parameters as found in LAC 43:XIX.Chapter 3 . . . .

. . . .

This plan should use [Risk Evaluation/Corrective Action Program ("RECAP")] non-industrial standards to achieve delineation and compliance of the soils.

. . . .

**B. GROUNDWATER**

. . . .

At this time, it is not known if the A zone is connected to the ditch that traverses through the property. If the aquifer and the ditch are connected, the ditch will be the point of exposure and a dilution attenuation factor (DAF) will need to be established. This will need to be verified by measuring the ditch depth and comparing it to nearby borings. When asked during the hearing, neither party measured the depth of the ditch. . . .

. . . .

A plan should be submitted to the agency to address the requirements of the MFP prior to implementation. Submittal to the agency should use non-industrial RECAP standards for delineation of the site.

(Footnotes omitted).

In another section regarding the Southwest Tract, the LDNR MFP stated that "[s]oil sample locations SB-7 (SAR) and B-23 (SAR, EC, and ESP) exceed[] salt parameters but no plans are presented for remediation. A plan must be provided to address the exceedances. . . ." Thus, in the section pertaining to the Southwest Tract, the LDNR MFP ordered a remediation plan where the data had already demonstrated a need for remediation but did not delineate what that remediation plan would be. In other instances, the LDNR MFP did not establish what remediation standards would apply if the additional delineation demonstrated the need for remediation. However, in other sections, the LDNR MFP specified the

9

remediation. For example, the LDNR MFP partially adopted Chevron's proposal for soil, which included remediation in accordance with 29-B for metals and hydrocarbons at all depths and for salt parameters within the effective root zone. Further, in discussing the Northeast Tract, the LDNR MFP stated that "[t]reatment [of the soil] will consist of surface amendments and mixing and blending of soils."

The LDNR MFP set a "total cost for the known remediation and soil treatment areas, further delineation of constituents of concern and groundwater monitoring" at $2,173,317. The LDNR MFP noted that "[t]his value does not include any further remediation or delineation that may be required once investigation and delineation is complete. Further costs will be provided in submittals by Chevron as the plans are developed and the areas are fully delineated." The LDNR MFP ended with the statement:

> In consideration of, and based on all the evidence, the LDNR Most Feasible Plan is supported by written reasons incorporated herein, is the most reasonable (feasible) plan which addresses the limited admission in conformity with the Louisiana Constitution, Article IX, Section 1 to protect the environment, public health, safety, and welfare, and is in compliance with the specific relevant and applicable standards and regulations as mandate[d] by La. R.S. 30:29.

The Commissioner of Conservation signed the LDNR MFP, and LDNR submitted the LDNR MFP to the trial court on April 1, 2021.

### Chevron's "Motion to Adopt the 'Most Feasible Plan'"

Subsequently, on May 20, 2021, Chevron filed its Motion to Adopt wherein it moved for the trial court to adopt the LDNR MFP "as the most feasible plan to evaluate or remediate to applicable regulatory standards the environmental damage for which Chevron admitted responsibility." Therein, Chevron also contended that Hero had "offered no 'feasible plan' under Act 312 and failed to present any

10

evidence to overcome the presumption that the plan structured by LDNR is the 'most feasible plan.'" Further, Chevron explained:

> As this Court is aware, LDNR has requested additional information pertaining to the soil and groundwater in specified areas of the property. Chevron is ready to submit a work plan to LDNR in accordance with the LDNR Most Feasible Plan to perform the requested investigation and testing but cannot do so until the Court adopts the LDNR Most Feasible Plan as the "most feasible plan" under Act 312.[14] Once the LDNR Most Feasible Plan is adopted, Chevron will collect the data that LDNR has requested and begin performing the work required by the Plan. There is no reason to delay the evaluation and remediation approved and structured by LDNR. Accordingly, Chevron requests that the Court adopt the LDNR Most Feasible Plan as the most feasible plan under Act 312 and order Chevron to fund and perform the work required by the Plan.

The trial court also permitted Hero to submit a proposed plan ("Hero's Proposal"), and the trial court conducted a hearing over the course of four days in May and June 2022 regarding the LDNR MFP and Hero's Proposal.

***Trial Court Hearing on Chevron's Motion to Adopt***

The trial court conducted the preponderance hearing on Chevron's Motion to Adopt on May 25, 2022; May 26, 2022; May 27, 2022; and July 26, 2022. Below is a summary of the testimony we find most relevant from the trial court's hearing.

*Ms. Love's Testimony*

Of note from the trial court's hearing, the parties stipulated at the outset that "[i]f called live to testify Ms. Jamie Love would give . . . the exact same answers she did in her deposition testimony and her live testimony in court" during the jury trial (i.e., the jury trial at issue in *Hero I*). Thus, Ms. Love did not testify again

---

[14] After a party admits responsibility under Act 312 and submits a plan to LDNR, "no party to the litigation, either directly or indirectly, shall have ex parte communication with any employee, contractor, or representative of the department regarding the formation of the feasible plan or an agency providing comments to the department regarding the formation of the feasible plan." La. R.S. 30:29(C)(2)(b)

before the trial court, but portions of her testimony bear repeating because, as mentioned previously, Ms. Love served on the LDNR panel that structured and approved the LDNR MFP. In fact, Ms. Love was the primary author of the LDNR MFP.

When asked her understanding of LDNR's role in the case of a limited admission, Ms. Love responded, "We review all the data. [It is] really the same thing we do for every site, but a little more intense when it comes to these limited admissions. But we review all the data, we analyze it for 29-B and RECAP standards." She testified that the LDNR MFP uses both 29-B and RECAP to evaluate the subject property. Ms. Love described 29-B as "what is used for closure within the Office of Conservation for pits and other areas, and cleanup." She confirmed that 29-B is a "regulation to gauge whether or not [there is] environmental contamination that needs to be addressed." In her testimony, Ms. Love also indicated that in some instances, the LDNR MFP requires further evaluation to verify that there is no environmental risk requiring remediation. In fact, she confirmed that it is "usual" and "more common than not" for LDNR to ask for more data. Ms. Love refused to speculate, however, when asked whether additional delineation would necessarily result in additional remediation. In discussing the potential granting of exceptions to remediation standards, Ms. Love explained that LDNR reserved its determination to grant any exceptions until it received all of the requested data. She affirmed that LDNR submitted the LDNR MFP plan to other agencies for comment.

*Testimony of Steven Whitting, P.G.*

Hero offered the testimony of Steven Whitting, P.G. ("Mr. Whitting"), whom the trial court qualified as an expert in site assessment, remediation,

geology, and RECAP. Mr. Whitting testified that he obtained a Bachelor of Science in geology; was a professional geoscientist in Louisiana; and had been a geologist for approximately forty years at the time of the hearing. In terms of his involvement in this case, Mr. Whitting testified that Hero asked him to prepare an MFP. However, Mr. Whitting explained that this constituted his first experience in the MFP process under Act 312, and he affirmed that he had made no effort to confirm that his plan was in compliance with Act 312 nor had he submitted his plan to LDNR for review. In discussing the LDNR MFP, counsel for Hero asked Mr. Whitting whether he "disagree[d] with [L]DNR that additional sampling should take place to further delineate contamination," and he responded, "No, I do not disagree." He stated that delineation would "[f]urther refine [the scope of the remediation] in terms of identifying the extent of the remediation."

Then, on cross-examination, counsel for Chevron asked Mr. Whitting about the plan proposed by Hero ("Hero Plan"), and he explained that he "did not prepare that plan." Rather, as Mr. Whitting explained, the Hero Plan "was based upon - - the redline version was based on my plan." He further stated that "[t]he redline version" was prepared by counsel for Hero, who instructed Mr. Whitting as to what standards to include when he drafted his plan. As a result of that instruction, Mr. Whitting explained that the plan he presented to Hero evaluated the property in a different manner than how he would normally evaluate properties outside of litigation.

In discussing how he would normally evaluate and remediate properties, Mr. Whitting confirmed that remediation should only occur when necessary, i.e., when the data and delineation reveal the need for it. To this end, the following colloquy occurred during Mr. Whitting's testimony:

Q      . . . You normally collect data; is that correct?

A      . . . [That is] part of what I do, yes.

      . . . .

Q      And then based upon that data you submit . . . a remediation plan to a regulatory agency to review; is that right?

A      A remediation or if it is . . . still in the investigation phase . . . I would evaluate that and then we would submit a - - a work plan to the agency for further delineation.

Additionally, counsel for Chevron asked for Mr. Whitting's thoughts on the

LDNR MFP whereupon this discussion followed:

Q      [It is] my understanding you do not disagree with LDNR's Most Feasible Plan; is that correct?

A      In as much as - - I mean, certain portions of it - -

Q      [You are] not here to criticize LDNR's Most Feasible Plan - -

A      No. Actually, I - - relied upon the information that was identified as far as the additional sampling locations.

Q      And [that is] where I was going. [You are] actually relying upon the LDNR's Most Feasible Plan as part of your plan, correct?

A      Yes . . . the portions that relied upon ERM and ICON's data.

Q      Your plan assumes that the LDNR sampling plan will take place; is that correct?

A      That is correct.

Q      In fact, you need LDNR's sampling plan to refine your plan; is that correct?

A      That is correct.

Q      And we agree that the samples that LDNR has suggested to be collected will be analyzed according to the regulatory standards set forth in LDNR's Most Feasible Plan; is that correct?

A      That is correct.
Q      And you agree with me that those standards are 29-B and RECAP; is that correct?

14

A    Correct.

. . . .

Q    . . . [T]he numerical standards that LDNR has - - will apply to the data set [that is] collected, correct?

A    Well, even if [it is] not specifically spelled out in the plan.

Q    Correct.

A    [That is] what [I am] getting at, yes.

Q    So you agree with me?

A    Yes, I would agree with that.

Thus, as the above excerpt demonstrates, Mr. Whitting confirmed that both the LDNR MFP and the plan he submitted to Hero require additional sampling. He stated that both plans needed "additional refining."

However, Mr. Whitting's testimony failed to indicate that he held a belief that a plan requiring additional sampling and delineation is flawed. Rather, Mr. Whitting further testified along these lines of the importance of sampling and delineation when he stated "without the additional sampling how can you establish those numerical standards to include in the MFP?" The following colloquy ensued:

Q    You would agree with me that a better approach would be to complete the LDNR Sampling plan, submit the data to LDNR and hear whether or not LDNR needs additional data before moving forward?

A    Ideally, yes.

Q    And after we collect all that data the LDNR requires, you will agree with me, then at that moment we would submit a remedial plan to LDNR, right?

A    Or a - - Or an amended corrective action plan or remedial plan.

Q      And we would wait to hear what LDNR has to say about how to move forward with respect to site conditions for soil and groundwater, correct?

A      Well, we would need their approval of the plan to implement it.

Q      And [that is] what was going to be my next question. You would need their concurrence or their approval to move forward with any - - with whatever remediation that LDNR requires, correct?

A      To implement the plan you would need their approval.

Q      And [that is] the reason why you want the LDNR sampling data to take place is in order to allow the regulatory agency to make informed decisions what to do on this particular piece of property, correct?

A      Yes, and . . . to incorporate . . . the data . . .

Q      And if I [was not] sitting here, [the trial judge was not] sitting here, all these lawyers [were not] sitting here, [that is] what the consultants would be doing right now, correct?

A      Correct.

Thus, as a whole, Mr. Whitting's testimony indicated his agreement with the approach taken in the LDNR MFP to have more data, sampling, and delineation before setting remediation because such a process results in a more informed decision.

*David Angle, P.G.*

David Angle, P.G. ("Mr. Angle"), testified on behalf of Chevron. The parties stipulated to Mr. Angle being qualified as an expert in site assessment; remediation; geology; hydrogeology; soil and groundwater fate and transport; and the application of regulatory standards and procedures. Accordingly, the trial court qualified Mr. Angle as an expert in these six fields. Mr. Angle testified that, at the time of the hearing, he had experience in eight prior Act 312 public hearings regarding the adoption of MFPs. When asked, based on his experience, "what is

16

the process by which an MFP . . . is adopted and implemented," Mr. Angle responded, "[it is] basically an iterative process." Additionally, when asked whether "[i]n every MFP, LDNR requests sampling data," Mr. Angle responded, "Correct." He further defined "delineation" as the "additional . . . testing work that will be done." Mr. Angle also testified that, based on his experience, LDNR makes its decision to either grant or deny exceptions to 29-B remediation standards only after receiving all of the data that it has been collecting and evaluating.

Discussing the regulatory standards applicable to "legacy sites in Louisiana," Mr. Angle stated that "Statewide Order 29-B and RECAP" are "almost prescriptive." He explained that those are the only regulations LDNR has applied in its MFPs. Counsel for Chevron noted that a criticism from Hero was that the LDNR MFP fails to identify specific remedial standards but asked Mr. Angle to confirm that "the applicable regulatory standards have been identified." In response, Mr. Angle stated, "Correct, 29-B and RECAP."

***October 24, 2022 Judgment and Reasons for Judgment***

*Judgment*

Thereafter, on October 24, 2022, the trial court issued a judgment. The judgment stated, in pertinent part:

> **IT IS ORDERED, ADJUDGED, AND DECREED BY THE COURT** that Plaintiff Hero Lands Company, L.L.C.,'s Objections to Defendant Chevron U.S.A. Inc., (Chevron)'s Proposed Most Feasible Plan (MFP) not meeting the statutory requirements for a (MFP) pursuant to La. R.S. 30:29(C)(5) is hereby **OVERRULED**.

> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that Chevron U.S.A., Inc., (Chevron)'s Objections to Hero Lands Company, L.L.C., submitting to the Court for consideration their Proposed Most Feasible Plan (MFP) pursuant to La. R.S. 30:29(C)(5) including Untimely Expert Reports is hereby **OVERRULED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that Chevron U.S.A., Inc., (Chevron)'s Motion to Adopt the "Most Feasible Plan" filed on May 20, 2021, in accordance with La. R.S. 30:29(C)(5) is hereby granted.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that The Louisiana Department of Natural Resources, Office of Conservation's Most Feasible Plan for Necessary Evaluation is adopted as the "Most Feasible Plan" in accordance with La. R.S. 30:29(C)(5).

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that Hero Lands Company L.L.C. failed to establish by a preponderance of the evidence that their alternative Most Feasible Plan is the Most Feasible Plan in accordance La. R.S. 30:29(C)(5).

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that Chevron U.S.A., Inc., (Chevron) submit the required LDNR workplan to the LDNR within 30 days of the signing of this Judgment and complete all the work required pursuant to the Most Feasible Plan.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that Chevron U.S.A., Inc., (Chevron) deposit $2,500,000 (two million, five hundred thousand dollars) into the registry of the court to fund the plan's implementation within thirty (30) days of the signing of this judgment. Chevron U.S.A. Inc., (Chevron) may submit a bond in lieu of a cash deposit.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that upon completion of the evaluation contemplated by the LDNR Plan, the LDNR shall submit a final decision as to any additional remediation of the environmental damage found on the property that is required to be performed by Chevron to this Court.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that if the Louisiana Department of Natural Resources determines additional evaluation is necessary after Chevron U.S.A. Inc., (Chevron) has completed their evaluation in accordance with the LDNR Plan before making a final decision on remediation, then the Louisiana Department of Natural Resources shall submit a decision as to what additional evaluation is required to be performed by Chevron U.S.A. Inc., (Chevron) and the reasons for said additional evaluation to this Court.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED BY THE COURT** that the Louisiana Department of Natural Resources produce a most feasible plan for environmental remediation found on the property upon the completion of the evaluation required in their Most Feasible Plan.

*Reasons for Judgment*

The trial court also provided reasons for judgment per La. R.S. 30:29(C)(5).[15] Therein, the trial court emphasized the presumption that an MFP approved by LDNR is the most feasible one and that Act 312 directs trial courts to accept the plan approved by LDNR unless another party rebuts that presumption. In particular, the trial court explained that Hero's main argument was that the LDNR MFP was statutorily and constitutionally invalid because "regardless of whether the [LDNR MFP] is evaluation or remediation based, the plan itself fails to contain a statement of the applicable standards and regulations that will apply to any remediation once the evaluation is complete." The trial court concluded that, in so arguing, Hero failed to rebut the presumption attached to the LDNR MFP because "this [c]ourt interprets La. R.S. 30:29 to indicate if the LDNR does not have enough information to conclude what applicable remediation standards are necessary to remedy the environmental damage to the property, then the LDNR must obtain the necessary information by requiring the party to conduct evaluations on the effected property." Further, the trial court "agree[d] with the position of Chevron that under Act 312, the LDNR MFP does not have to be a 'final complete plan' for remediation at this time." To this end, the trial court observed that "[i]f the LDNR does not have sufficient information, the Court cannot expect the LDNR to assume or hypothesize which remediation methods are

---

[15] Louisiana Revised Statutes 30:29(C)(5) states that "[t]he court shall enter a judgment adopting a plan *with written reasons assigned.*" (Emphasis added.)

going to be necessary to remediate the environmental damage." Though the trial court acknowledged that Act 312 "does not distinguish the difference between an evaluation plan and a remediation plan," the trial court noted that Act 312 includes both words ("evaluation" and "remediation"), which are "distinct." Thus, the trial court concluded that the failure of the LDNR MFP to specify remediation standards did not render the LDNR MFP invalid.

The trial court also noted that the Hero Plan was neither reviewed by LDNR nor presented at a public hearing. Comparing the experts presented at the hearing on the Motion to Adopt, the trial court found the experts in support of the LDNR MFP more credible than those in support of the Hero Plan. Therefore, this constituted another reason the trial court found that Hero failed to rebut the presumption attached to the LDNR MFP. Additionally, the trial court noted that it retains oversight to ensure that, where necessary, the LDNR MFP "addresses the public health and safety concerns of the public and the environment in accordance with Act 312."

Thereafter, Hero timely filed a Motion for Appeal on January 3, 2023.[16]

**ASSIGNMENTS OF ERROR**

In its brief to this Court, Hero asserts three assignments of error. Specifically, it contends:

---

[16] Initially, Hero's Motion for Appeal appeared untimely because it bore a "Filed" stamp from the clerk of court for the trial court with the date January 5, 2023, and the deadline for Hero to appeal was January 3, 2023. Accordingly, on September 25, 2023, this Court issued an Order for Hero to show cause why its appeal should not be dismissed as untimely. Hero responded on September 26, 2023, explaining that it filed its Motion for Appeal on January 3, 2023; and Hero attached as an exhibit a "Facsimile Receipt Certificate," which demonstrated that Hero fax-filed its Motion for Appeal on January 3, 2023.

1. The [trial] [c]ourt erred in adopting an MFP that does not meet the statutory requirements for a "feasible plan" because it does not address the remediation standards that will apply at the end of the required delineation.

2. The [trial] [c]ourt erred in adopting an MFP that does not meet the statutory requirements for a "feasible plan" because it leaves open the possibility that LDNR could subsequently order a remediation that allows Chevron exceptions from the applicable remedial standards.

3. The [trial] [c]ourt erred in rejecting Hero's proposed alternative MFP that is a "feasible plan," where Hero's proposed plan rectifies the deficiencies in the LDNR MFP by stating applicable remedial standards and foreclosing exceptions from those standards.

(Footnotes omitted.)

In our review of the briefs and the record, however, we find that resolution of this appeal necessitates that we decide three issues: 1) whether, under Act 312, a lack of complete delineation and determination of exceptions at the outset is fatal to MFPs; 2) whether MFPs must establish all remediation standards or if MFPs can call for further evaluation to determine whether, and to what extent, remediation is even required; and 3) whether Hero proved by a preponderance of the evidence that its plan was more feasible and thus rebutted the presumption attached to the LDNR MFP.

## DISCUSSION

### *Standard of Review*

This case centers on Act 312. Regarding the standard of appellate review, it provides, in pertinent part:

> [(6)] (b) Any appeal under this Section shall be a de novo review and shall be heard with preference and on an expedited basis.
>
> (c) The appellate court may affirm the trial court's adoption of a plan or may adopt a feasible plan in conformity with this Section and shall issue written reasons for its decision.

21

La. R.S. 30:29(6). Thus, we review this matter *de novo*, noting that we must either affirm the trial court's judgment or adopt our own most feasible plan per the mandates of Act 312.

### *Statutory Background*

Article IX, Section 1 of the Louisiana Constitution states that "[t]he natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy." In *State v. Louisiana Land & Exploration Co.*, the Louisiana Supreme Court explained that Act 312 originated as the Louisiana Legislature's response to the court's decision in *Corbello v. Iowa Production*, 2002-0826 (La. 2/25/03), 850 So.2d 686. 2012-0884, pp. 13-15 (La. 1/30/13), 110 So.3d 1038, 1048-49. In *Corbello*, the Louisiana Supreme Court had recognized "the two opposing public policy concerns which the then-existing state of the law created." *Id.* at p. 14, 110 So.3d at 1048. That is, "a landowner suing for remediation of contaminated land could sue and receive remediation damages, yet was under no obligation to use the damage award to restore the property. At the same time, there was a strong possibility that land would remain polluted if landowners could not bring suit for remediation." *Id.* at pp. 14-15, 110 So.3d at 1048 (citing *Corbello*, 2002-0826, p. 20, 850 So.2d at 701). As further explained in *Louisiana Land & Exploration Co.*, "The legislature responded in the 2003 legislative session by enacting La. R.S. 30:2015.1, . . . which set forth procedures for the remediation of usable groundwater in the public's interest." *Id.* at p. 15, 110 So.3d at 1049. Then, "[i]n

2006, the legislature extended its remediation procedures into other environmental media by enacting Act 312, which established a procedure to ensure the remediation of oilfield sites and exploration and production sites in La. R.S. 30:29." *Id.*

***Important Sections of Act 312***

Because Act 312 is a long, multi-part statute, at this juncture it is worth highlighting some of the sections of it that are most relevant to this appeal. Act 312 provides, in pertinent part:

> (C)(1) If at any time during the proceeding a party admits liability for environmental damage . . . , the court shall order the party or parties who admit responsibility . . . to develop a plan or submittal for the evaluation or remediation to applicable regulatory standards of the contamination that resulted in the environmental damage. . . . Any plan or submittal shall include an estimation of cost to implement the plan.
>
> (2)(a) Within sixty days from the last day on which any party may provide the department with a plan, comment, or response to a plan as provided in Paragraph (C)(1) of this Section, the department shall conduct a public hearing on the plan or plans submitted. When a public hearing is held following a limited admission pursuant to the Code of Civil Procedure Article 1563,[17] then the department shall not

---

[17] Louisiana Code of Civil Procedure Article 1563 states, in part:

> A. (1) If any party admits liability for environmental damage pursuant to [La.] R.S. 30:29, that party may elect to limit this admission of liability for environmental damage to responsibility for implementing the most feasible plan to evaluate, and if necessary, remediate all or a portion of the contamination that is the subject of the litigation to applicable regulatory standards, hereinafter referred to as a "limited admission". . . .
>
> (2) Upon the expiration of the delay in which a party may file a limited admission under Subparagraph (5) of this Paragraph, and if one or more of the defendants have made a timely limited admission, the court shall refer the matter to the Department of Natural Resources, office of conservation, hereinafter referred to as the "department", to conduct a public hearing to approve or structure a plan which the department determines to be the most feasible plan to evaluate or remediate the environmental damage under the applicable

conduct an additional public hearing pursuant to this Section for the same environmental damage. Within sixty days of the conclusion of the hearing, the department shall approve or structure a final plan, or if applicable, a preliminary plan pursuant to Subparagraph (C)(3)(b) of this Section, based on the evidence submitted *which the department determines to be the most feasible plan to evaluate or remediate* the environmental damage and protect the health, safety, and welfare of the people. The department shall issue written reasons for the plan it approves or structures. . . .

. . . .

[(C)(2)](c) In all cases in which a party makes a limited admission of liability under the provisions of the Code of Civil Procedure Article 1563, *there shall be a rebuttable presumption that the plan approved or structured by the department, after consultation with the Department of Environmental Quality as appropriate, shall be the most feasible plan to evaluate or remediate* to applicable regulatory standards the environmental damage for which responsibility is admitted. . . .

(3)(a) The department shall use and apply the applicable regulatory standards in approving or structuring a plan that the department determines to be *the most feasible plan to evaluate or remediate* the environmental damage.

. . . .

(5) The court shall adopt the plan approved by the department, unless a party proves by a preponderance of the evidence that another plan is a more feasible plan to adequately protect the environment and the public health, safety, and welfare.

. . . .

F. The court and the department shall retain oversight to ensure compliance with the plan. The party or parties admitting responsibility or the party or parties found legally responsible by the court shall file progress reports periodically as the court or the department may require.

---

regulatory standards pursuant to the provisions of R.S. 30:29. There shall be a rebuttable presumption that the plan approved or structured by the department, after consultation with the Department of Environmental Quality as appropriate, shall be the most feasible plan to evaluate or remediate the environmental damage under the applicable regulatory standards pursuant to the provisions of R.S. 30:29.

G. The provisions of this Section are intended to ensure *evaluation or remediation* of environmental damage. . . .

I. For the purposes of this Section, the following terms shall have the following meanings:

. . . .

(3) "Evaluation or remediation" shall include but not be limited to investigation, testing, monitoring, containment, prevention, or abatement.

(4) "Feasible Plan" means the most reasonable plan which addresses environmental damage in conformity with the requirements of Article IX, Section 1 of the Constitution of Louisiana to protect the environment, public health, safety and welfare, and is in compliance with the specific relevant and applicable standards and regulations promulgated by a state agency in accordance with the Administrative Procedure Act in effect at the time of clean up to remediate contamination resulting from oilfield or exploration and production operations or waste.

La. R.S. 30:29 (emphasis added).

As the above excerpt demonstrates, LDNR is tasked with developing a plan to *evaluate or remediate* environmental damage. The definition of "evaluation or remediation" encompasses the collection of additional, future data. Additionally, in cases of a limited admission such as the matter *sub judice*, the plan approved by LDNR carries with it a rebuttable presumption that it is the most feasible plan to so evaluate or remediate unless a party proves by a preponderance of the evidence that another plan is a more feasible one. Further, the trial court and LDNR retain oversight to ensure compliance with the most feasible plan.

### Issue Number One: Whether the Alleged Lack of Complete Delineation is Fatal to the MFP

Though not specifically assigned as an error, Hero repeatedly notes throughout its Appellant Brief that Chevron failed to completely delineate the vertical and horizontal extent of the environmental damage. In support of its

25

contention that complete delineation was necessary, Hero points to LAC 43:XIX § 611(B), which is part of LDNR's implementing regulations for Act 312. We address this issue first because Hero indicates that the lack of complete delineation is what led to the LDNR MFP not providing remedial standards, which Hero contends is problematic in the LDNR MFP.

As mentioned above, Hero cites LAC 43:XIX § 611(B) for its contention that complete delineation was required. This is found in Chapter 6 of the Louisiana Administrative Code and titled "Procedures for Hearings and the Submission and Approval of Plans for the Remediation of E and P Sites in Accordance with [La.] R.S. 30:29." In particular, LAC 43:XIX § 611(B) pertains to the "[s]pecific requirements of plans" and provides, in pertinent part, that "[e]ach plan shall fully delineate the vertical and horizontal extent of the environmental damage." However, of note, another one of LDNR's Act 312 implementing regulations is titled "Penalty for Non-Compliance." It states:

> A. Failure to comply with the provisions of or the spirit of these rules of procedure may prevent plan, comment or response from being advertised or heard, or may prevent a party from presenting evidence at the hearing, but *any approval or structure of a plan issued by the commissioner shall not be invalid by operation of this rule*.

LAC 43:XIX § 637 (emphasis added). The foregoing language is clear that non-compliance with LDNR's Act 312 implementing regulations is not fatal to an MFP.

Additionally, in its second assignment of error, Hero argues that the LDNR MFP leaves open the possibility that Chevron will benefit from exceptions to the remediation standards in contravention of LAC 43:XIX § 611. Regarding exceptions, the regulation provides:

[F.] Any party that seeks an exception under the provisions of §
319 of Statewide Order 29-B shall submit:

. . . .

2. a separate plan that includes:

a. sufficient proof that there is good cause to grant an exception
or exceptions sought under § 319;

b. sufficient proof showing that the exception or exceptions
sought under § 319 do not endanger USDW's; and

c. a specific citation to the Louisiana rules, regulations or
statutes sought to be applied in lieu of Statewide Order 29-B.

LAC 43:XIX § 611(F). Again, however, per LAC 43:XIX § 637, even if Chevron

obtains future exceptions, this will not invalidate the LDNR MFP because it was

approved by LDNR. Accordingly, we decline to invalidate the LDNR MFP on

these bases.

***Issue Number Two: Whether an MFP Must Establish All Remediation
Standards or if an MFP Can Call for Further Evaluation to Determine Whether,
and to What Extent, Remediation is Required***

Hero's first and second assignments of error center on whether a trial court

can adopt an MFP that calls for further evaluation and does not pre-determine

remediation standards and exceptions that may apply if the additional evaluation

ultimately demonstrates that more remediation is necessary. As Chevron accurately

phrases it, "[a]t its core, Hero's complaint is that the LDNR [MFP] does not make

a final decision on whether any additional remediation will ultimately be required."

Chevron further contends that "all of Hero's criticisms share a common flaw: Hero

incorrectly assumes that LDNR must always structure a plan that includes final

decisions on remediation." We agree with Chevron that this is an incorrect

assumption on Hero's part.

27

Because there is very little case law on this issue, we turn to statutory interpretation to explain whether Act 312 allows for an evaluation most feasible plan; a remediation most feasible plan; or a hybrid evaluation-remediation plan, i.e., a mix of both. Regarding the Louisiana Revised Statutes, "[w]hen the wording of a Section [of the Revised Statutes] is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." La. R.S. 1:4. In interpreting this statute, the Louisiana Supreme Court has explained that "[c]ourts are bound to give effect, if possible, to all parts of a law and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to and preserving every word can legitimately be found." *Fairbanks Dev., LLC v. Johnson*, 2020-01031, pp. 5-6 (La. 9/30/21), 330 So.3d 183, 187 (citing *Kirt v. Metzinger*, 2019-1162, p. 6 (La. 4/3/20), 341 So.3d 1211, 1214-15). Additionally, "[l]egislation is a solemn expression of legislative will." La. C.C. art. 2. Therefore, "[t]he essential question in all cases of statutory interpretation is legislative intent and the ascertainment of the reason or reasons that prompted the legislature to enact the law." *Caldwell v. Janssen Pharm., Inc.*, 2012-2447, p. 10 (La. 1/28/14), 144 So.3d 898, 907 (first citing *Pumphrey v. City of New Orleans*, 2005-979, p. 11 (La. 4/4/06), 925 So.2d 1202, 1210; then citing *In re Succession of Boyter*, 1999-0761, p. 9 (La.1/7/00), 756 So.2d 1122, 1128). "The determination of the legislature's will must start with the language of the statute itself." *La. Land & Exploration Co.*, 2012-0884, p. 8, 110 So.3d at 1044 (citing *McGlothlin v. Christus St. Patrick Hosp.*, 2010-2775, p. 11 (La. 7/1/11), 65 So.3d 1218, 1227). "It is also well established that the Legislature is presumed to enact each statute with deliberation and with full knowledge of all existing laws on the same subject." *Id.*

at p. 9, 110 So.3d at 1045 (quoting *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 2007-2371, p. 13 (La. 7/1/08), 998 So.2d 16, 27).

The purpose of the legislation at issue herein, Act 312, was to create a statutory obligation that plaintiffs who are awarded remediation damages must actually perform the remediation work "to remediate the property to a point that protects the public's interest" instead of pocketing the money. *Id.* at p. 15, 110 So.3d at 1049. In Subsection (A) of Act 312, the Legislature stated its intention in enacting the legislation:

> The legislature hereby finds and declares that Article IX, Section 1 of the Constitution of Louisiana mandates that the natural resources and the environment of the state, including ground water, are to be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people and further mandates that the legislature enact laws to implement this policy. It is the duty of the legislature to set forth procedures to ensure that damage to the environment is remediated to a standard that protects the public interest. To this end, this Section provides the procedure for judicial resolution of claims for environmental damage to property arising from activities subject to the jurisdiction of the Department of Natural Resources, office of conservation. The provisions of this Section shall be implemented upon receipt of timely notice as required by Paragraph (B)(1) of this Section. The provisions of this Section shall not be construed to impede or limit provisions under private contracts imposing remediation obligations in excess of the requirements of the department or limit the right of a party to a private contract to enforce any contract provision in a court of proper jurisdiction.

Thus, the purpose of the Act is "remediation of the property to the extent of the public's interest." *La. Land & Exploration Co.*, 2012-0884, p. 16, 110 So.3d at 1049.

We turn to the rest of the language of Act 312 to determine if the Legislature intended to require that feasible plans must include all final remediation decisions in achieving that purpose. As excerpted previously, Act 312 defines "Feasible Plan" as:

> [T]he most reasonable plan which addresses environmental damage in conformity with the requirements of Louisiana Constitution Article IX, Section 1 to protect the environment, public health, safety and welfare, and is in compliance with the specific relevant and applicable standards and regulations promulgated by a state agency in accordance with the Administrative Procedure Act in effect at the time of clean up to remediate contamination resulting from oilfield or exploration and production operations or waste.

Though the definition of feasible plan does not use the word "evaluation" or "evaluate," Act 312 elsewhere repeatedly uses the phrases "evaluation or remediation" and "evaluate or remediate" regarding the MFP. Act 312 tellingly specifies that "[t]he provisions of this Section are intended to ensure evaluation or remediation of environmental damage." La. R.S. 30:29(G). Further, Act 312 defines "Evaluation or remediation" as "includ[ing]" but not . . . limited to investigation, testing, monitoring, containment, prevention, or abatement." La. R.S. 30:29(I)(4). Considering Act 312's use of "evaluation" and "evaluate," this indicates that Act 312 provides an option for "evaluation plans." That is, if the Legislature intended for Act 312 to permit the issuance of a plan based solely on the initial data that conclusively determines the necessity and extent of remediation, then the Legislature would not have included the words "evaluation" and "evaluate" throughout Act 312. To hold that a most feasible plan must set all final remediation decisions would render meaningless the use of the words "evaluation" and "evaluate" throughout the statute in contravention of the laws of statutory interpretation. *See Fairbanks Dev., LLC*, 2020-01031, p. 5, 330 So.3d at 187.

Moreover, such an interpretation does not thwart or frustrate the Legislature's intent in enacting Act 312. As mentioned previously, the purpose of Act 312 is "remediation of the property to the extent of the public's interest." *La.*

*Land & Exploration Co.*, 2012-0884, p. 17, 110 So.3d at 1049. The Legislature enacted Act 312 to ensure that landowners actually remediated the land instead of holding onto damages awards, not to enact a strict regime by which all decisions must be made and incorporated into a single plan even if LDNR finds additional evaluation to be necessary. By permitting further evaluation and setting remediation decisions, if necessary, based on that further evaluation, the process is still aimed at remediating to the extent of the public's interest.

Additionally, such an interpretation is supported by the decision rendered by the Louisiana Third Circuit Court of Appeal ("Third Circuit") in *Sweet Lake Land & Oil Co. v. Oleum Operating Co., L.C.*, wherein the trial court rejected the plan proposed by LDNR, and the Third Circuit affirmed. 2017-464 (La. App. 3 Cir. 10/18/17), 229 So.3d 993. In framing the case, the Third Circuit explained that "[t]he primary issue is whether the trial court can order LDNR to re-submit a plan for remediation when the judgment called for such a plan and the originally submitted plan still requires evaluation." *Id.* at 11, 229 So.3d at 1001. Additionally, in explaining the arguments asserted by the appellant, the Third Circuit stated, "[u]nder the Act, the plan filed with the trial court—whether an 'evaluation' plan, a 'remediation' plan, or both—should be considered the final plan." *Id.* at pp. 7-8, 229 So.3d at 999-1000. In affirming the trial court's decision to reject the proposed plan, the Third Circuit noted that "[t]he problem herein is that the judgment called for a remediation plan, and no one disputes the LDNR plan is not strictly remedial because, even with the expert reports, LDNR did not have sufficient information to formulate a plan for remedial action in certain areas, namely groundwater contamination and flowlines." *Id.* at pp. 10-11, 229 So.3d at 1001. Thus, the Third Circuit based its affirmation on the fact that the trial court had specifically ordered

31

the production of a *remediation* plan. Further, the Third Circuit's discussion demonstrates that the Third Circuit interpreted Act 312 to allow for the production of an evaluation plan, a remediation plan, or a combination plan. Contrary to *Sweet Lake*, the trial court in the matter *sub judice* never ordered the production of a strictly remedial plan. *See also State v. La. Land & Exploration Co.*, 2017-830 (La. App. 3 Cir. 3/14/18), 241 So.3d 1258 (wherein the Third Circuit affirmed the trial court's adoption of the LDNR plan even though the dissenting judge complained that it contained too many "contingencies.")

Additionally, as excerpted previously, Act 312 references La. C.C.P. art. 1563, which states, in pertinent part, that "[i]f any party admits liability for environmental damage pursuant to [La.] R.S. 30:29, that party may elect to limit this admission of liability for environmental damage to responsibility for implementing the most feasible plan to evaluate, *and if necessary*, remediate all or a portion of the contamination that is the subject of the litigation." La. C.C.P. art. 1563(A)(1) (emphasis added). According to rules of statutory interpretation and construction, "the Legislature is presumed to enact each law with full knowledge of all existing laws on the same subject." *La. Land & Exploration Co.*, 2012-0884, p. 9, 110 So.3d at 1045 (quoting *M.J. Farms, Ltd.*, 2007-2371, p. 13, 998 So.2d at 16). Thus, this Court can presume that the Legislature enacted Act 312 with knowledge of the language in La. C.C.P. art. 1563 that the most feasible plan will "evaluate, and if necessary" lead to remediation.

We find further support for this interpretation from the testimony adduced in the matter *sub judice*. Ms. Love testified that it was "usual" and "more common

than not" for LDNR to request further evaluation.[18] She also defined 29-B as a "regulation to gauge whether or not [there is] environmental contamination that needs to be addressed," which definition indicates that 29-B (one of the evaluation standards included in the LDNR MFP) specifically leaves open the possibility that there might not even be contamination that needs to be addressed. Additionally, Mr. Whitting, who was Hero's own expert, indicated his agreement with the approach taken in the LDNR MFP to have more data, sampling, and delineation before setting a remediation plan because such a process results in a more informed decision. Further, Mr. Angle, in describing the Act 312 process, stated that "[it is] basically an iterative process" and that every MFP from LDNR requests additional data.

Additionally, we find it worth noting that LDNR and the trial court both retain oversight over this plan to ensure the ultimate goal of remediation where necessary. *See* La. R.S. 30:29(F).  Thus, we find that an MFP need not establish all remediation standards at the outset. Rather, an MFP can call for further evaluation to determine whether, to what extent, and to which standards remediation is required. Accordingly, we find no merit to Hero's contention that the LDNR MFP is invalid for failing to set all remediation standards when LDNR has determined in this matter that further evaluation is necessary.

---

[18] We note that our Opinion merely finds Ms. Love's testimony instructive and does not defer to her testimony as if it were LDNR's interpretation of Act 312. *See Davis v. State Bd. of Certified Pub. Accts. of La.*, 2013-0514, p. 13 (La. App. 4 Cir. 12/18/13), 131 So.3d 391, 399 (holding that we only defer to an agency's interpretation of its own regulations, not to an agency's interpretations of governing statutes and judicial decisions) (citations omitted).

***Issue Number Three: Whether Hero Proved by a Preponderance of the Evidence that Its Plan was More Feasible and Thus Rebutted the Presumption Attached to the LDNR MFP***

Under Act 312, "[i]n all cases in which a party makes a limited admission of liability under the provisions of the Code of Civil Procedure Article 1563, there shall be a rebuttable presumption that the plan approved or structured by the department . . . shall be the most feasible plan to evaluate or remediate to applicable regulatory standards the environmental damage for which responsibility is admitted." La. R.S. 30:29(C)(2)(c). Additionally, Act 312 mandates that "[t]he court shall adopt the plan approved by the department, unless a party proves by a preponderance of the evidence that another plan is a more feasible plan to adequately protect the environment and the public health, safety, and welfare." La. R.S. 30:29(C)(5). Given that statutory language and our previous conclusion, by logical extension, we find that Hero failed to rebut the presumption of "most feasible plan" that attached to LDNR's MFP because Hero has failed to prove its assertion that the LDNR MFP is statutorily or constitutionally invalid. Because Hero failed to overcome that presumption, we, like the trial court, conclude that the LDNR MFP is the most feasible plan in this matter per the mandates of Act 312. *See* La. R.S. 30:29(C)(2)(c).

## DECREE

For the foregoing reasons, we affirm the trial court's October 24, 2022 judgment, which granted the "Motion to Adopt Most Feasible Plan" filed by Chevron regarding the plan structured and approved by the LDNR.

**AFFIRMED**